598 F.2d 91
 12 ERC 1376, 194 U.S.App.D.C. 172, 8
Envtl. L. Rep. 20,811
 HERCULES INCORPORATED, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
VELSICOL CHEMICAL CORPORATION, Petitioner,
v.
Douglas M. COSTLE, Administrator, United States
Environmental Protection Agency, Respondent.
 Nos. 77-1248, 77-1349.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 23, 1978.
Decided Nov. 3, 1978.
 
 Roberts B. Owen, Washington, D. C., with whom Theodore L. Garrett, Washington, D. C., was on the brief, for petitioner in No. 77-1248.
 Charles A. O'Connor, III, Washington, D. C., with whom Kenneth W. Weinstein and Joe G. Hollingsworth, Washington, D. C., were on the brief, for petitioner in No. 77-1349.
 James W. Gentry, Jr., Chattanooga, Tenn., also entered an appearance for appellant in No. 77-1349.
 Alan W. Eckert and Lorraine Chang, Attys., Environmental Protection Agency and William L. Want, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Acting Asst. Atty. Gen., Dept. of Justice and Ridgway M. Hall, Jr., Associate Gen. Counsel, Environmental Protection Agency, Washington, D. C., were on the brief, for respondents.
 Robert V. Zener, Atty., Environmental Protection Agency and Peter R. Taft, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondents.
 TABLE OF CONTENTS
 Page
 I. FACTS AND PRIOR PROCEEDINGS........................................ 98
 A. Factual Background.............................................. 98
 B. Proceedings..................................................... 99
 II. APPLICABLE LAW.................................................... 100
III. SUBSTANTIVE ISSUES CONCERNING TOXAPHENE........................... 103
 A. Claims of the Parties.......................................... 103
 B. Statutory Issues............................................... 104
 C. Scope of Review................................................ 106
 D. Adequacy of the Basis for EPA's Regulations.................... 107
 1. EPA's policy judgments...................................... 107
 2. EPA's factual determinations leading to the numerical
 standard.................................................... 109
 IV. SUBSTANTIVE ISSUES CONCERNING ENDRIN.............................. 110
 A. Statutory Issues............................................... 110
 B. Review of the Support for EPA's Policy Determinations.......... 114
 1. Application factor.......................................... 114
 2. Mixing zone factor.......................................... 115
 V. PROCEDURAL ISSUES................................................. 117
 A. Applicable Standards Under the Administrative Procedure
 Act............................................................ 117
 B. Reliance by the Administrator on Staff Assistance.............. 119
 1. Background.................................................. 119
 2. Administrator's reliance on proposed findings and
 conclusions................................................. 122
 3. Contacts between judicial officer and rulemaking staff.
 C. Omission of the Tentative Decision............................. 128
 VI. COMPLIANCE TIME................................................... 130
VII. CONCLUSION........................................................ 131
 Before BAZELON, TAMM and ROBINSON, Circuit Judges.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 We are called upon in these consolidated cases to review challenges to the Environmental Protection Agency's (EPA) first regulations limiting discharges into the nation's waterways of two toxic substances, toxaphene and endrin, under the Federal Water Pollution Control Act Amendments.[1] For the reasons that follow, we uphold EPA's regulations.I. FACTS AND PRIOR PROCEEDINGS.
 
 
 2
 A. Factual Background.
 
 
 3
 Endrin is a chlorinated hydrocarbon first introduced about 1950.[2] It has been used as a pesticide for several decades, and is currently used for pest control on crops including cotton and sugar cane. At present, there is only one domestic manufacturer of endrin, Velsicol Chemical Corp. (Velsicol), which produces three to six million pounds a year. 42 Fed.Reg. 2595, 2600 (1977). Its endrin manufacturing plant is located at Memphis, Tennessee, and its discharges eventually reach the Mississippi River and are carried through the lower Mississippi to the Gulf of Mexico.
 
 
 4
 Evidence concerning the dangers of endrin to public health and the environment has been produced over the years since endrin was first introduced. In 1965, results from a study using rats suggested that it was carcinogenic. See 41 Fed.Reg. 31316 (1976).[3] EPA has found that endrin has caused fifty-two reported fish and wildlife kills, largely the result of leakage or runoff during agricultural use.[4] Id. at 31317. However, a massive fish kill in the lower Mississippi in 1963 was traced to discharges from Velsicol's Memphis plant. 42 Fed.Reg. 2591. Endrin is suspected in particular of threatening the brown pelican, an endangered species sensitive to endrin. 42 Fed.Reg. 2591; 41 Fed.Reg. 31317.
 
 
 5
 Regulatory authorities have taken a number of steps to control endrin. The Food and Drug Administration has established a ceiling on endrin levels in food. 42 Fed.Reg. 2591. Velsicol discharged, on the average, approximately seven pounds of endrin per day in the mid-1960's, Joint Appendix (App.) I 182, but, under public and governmental pressure, it has taken steps to reduce this discharge. In June 1974, EPA issued Velsicol a National Pollutant Discharge Elimination System (NPDES) permit allowing an average daily discharge of no more than one pound of endrin.[5] Velsicol failed to reduce its endrin discharge below an average of 2.5 pounds per day in 1975, App. I 184, and it was found in violation of its permit and was subject to civil penalties. United States v. Velsicol Chemical Corp., 9 ERC (BNA) 1723 (W.D.Tenn.1976). Under the regulations now under review, Velsicol is required to limit its discharge to approximately .005 pounds of endrin per day. 42 Fed.Reg. 2594 & n.1.
 
 
 6
 Toxaphene is also a chlorinated hydrocarbon pesticide. It has been used for several decades, and is currently used for pest control on cotton and livestock. In the recent past, toxaphene was produced by four manufacturers. See 41 Fed.Reg. 23590 (1976). Hercules, Inc. (Hercules) contends that it is now the only manufacturer that discharges any toxaphene into waterways, and thus, the only manufacturer affected by these regulations.[6] In 1975, total domestic production of toxaphene was approximately one hundred million pounds. App. I 205-11. Hercules' toxaphene manufacturing plant is located at Brunswick, Georgia, and its discharge flows into the Brunswick Estuary, an arm of the Atlantic Ocean.
 
 
 7
 Evidence concerning the danger of toxaphene to public health and the environment, particularly to fish, has been produced in the years since the chemical was first introduced. Application of toxaphene to agricultural land surrounding several bird refuges resulted in massive bird kills in 1960-62. App. I 157. Toxaphene was identified as a cause of fish kills because of the characteristic "broken back" syndrome it produces in fish. In 1969, strobane, a pesticide closely related to toxaphene, was identified as a carcinogen in mice. App. I 148. Toxaphene has been frequently found in clarified and treated municipal drinking water. App. I 152.
 
 
 8
 Prior to 1970, Hercules' plant operated without a pollution treatment system; and, as Hercules concedes, its discharge "had an adverse effect upon the ecology" of local waters. Brief for Petitioner Hercules at 4. Subsequently, Hercules received an NPDES permit from the State of Georgia limiting its allowable toxaphene discharge. By 1975, Hercules reduced its average discharges of toxaphene to .27 pounds per day. App. I 206. Under the regulations now on review, Hercules is required to reduce its discharges to approximately .00375 pounds per day. 42 Fed.Reg. 2606 & n.2.
 
 
 9
 B. Proceedings.
 
 
 10
 The early attempts of EPA to limit discharges of toxic substances are described in the opinion of this court in EDF v. EPA (PCBs), 194 U.S.App.D.C. --- at --- - ---, 598 F.2d 62, at 68-70 (1978), decided today, and thus, there is no need to repeat that saga in detail. Endrin and toxaphene were on EPA's July 1973 proposed list of toxic substances and its September 1973 final list. 38 Fed.Reg. 18044, 24342 (1973). In December 1973, EPA proposed standards for endrin and toxaphene, 38 Fed.Reg. 35388 (1973); but after the 1974 hearings, EPA failed to issue final standards.
 
 
 11
 After the 1974 hearings, EPA subjected endrin and toxaphene to further investigation and analysis. EPA conducted its own experiments concerning the effects of endrin and toxaphene on a variety of species at its National Environmental Research Laboratory in Gulf Breeze, Florida.[7] Based on these experiments and on other studies, the Chief of the Criterion Branch of EPA's Office of Water Planning and Standards, Dr. Leonard J. Guarraia, prepared Criteria Documents summarizing the available information on endrin and toxaphene. On June 10, 1976, EPA proposed standards for endrin and toxaphene. 41 Fed.Reg. 23576 (1976). The standards were of two kinds: Concentration limitations on the concentration of pollutant allowed in the discharges, and Mass limitations on the amount of pollutant allowed in the discharges. For endrin, the proposed concentration limitation was 1.5 parts per billion, and the proposed mass limitation was 0.0003 kg/kkg (kilogram (kg.)/thousand (kilo) kilogram (kkg.)) of endrin produced. 41 Fed.Reg. 23595. For toxaphene, the proposed concentration limitation was 1.5 parts per billion, and the proposed mass limitation was 0.00001 kg/kkg of toxaphene produced. Id.
 
 
 12
 In July 1976, EPA commenced an evidentiary hearing on the proposed endrin and toxaphene standards before an administrative law judge (ALJ), which was concluded on October 12 after sixteen days of testimony. EPA presented the testimony of twelve witnesses. Velsicol presented the testimony of four witnesses concerning endrin, and Hercules presented the testimony of six witnesses concerning toxaphene. The Environmental Defense Fund (EDF) presented the testimony of one witness concerning the carcinogenic effects of endrin and toxaphene. 42 Fed.Reg. 2592, 2602. Three other parties participated in the hearing and twelve persons filed written comments. At the close of the hearing the record was furnished to the EPA Administrator (Administrator) for his consideration.[8]
 
 
 13
 On January 3, 1977, the Administrator filed his final decision concerning endrin and toxaphene with the EPA hearing clerk,[9] and on January 12, the decision was published. 42 Fed.Reg. 2588. The final decision adopted the proposed concentration limitations for endrin and toxaphene, but adopted relaxed mass limitations of 0.0006 kg/kkg of endrin produced and 0.00003 kg/kkg of toxaphene produced.[10]
 
 
 14
 On the day the final standards were filed, the parties engaged in a customary "race to the courthouse." At 9:38 A.M., Hercules petitioned the United States Court of Appeals for the Fourth Circuit for review of the toxaphene regulations. However, the petition was premature as the standards were not filed until later in the day; Hercules filed a renewed petition for review two weeks later. At 11:13 A.M., the moment EPA filed its standards, EDF petitioned this court for review of the standards for both endrin and toxaphene. At 11:13 A.M., Velsicol also petitioned the United States Court of Appeals for the Sixth Circuit for review of the endrin regulations. Pursuant to motions by EPA, the Hercules and Velsicol petitions were transferred to this court. Subsequently, EDF's petition for review was dismissed on voluntary motion.[11] This court denied joint motions by Hercules and Velsicol for retransfer of their petitions and for expedition of the appeals.[12] Compliance with the standards was required by January 12, 1978.
 
 
 15
 II. APPLICABLE LAW.
 
 
 16
 EPA adopted the regulations now under review pursuant to authority conferred by the Federal Water Pollution Control Act Amendments of 1972 (1972 Act or the Act), 33 U.S.C. §§ 1251-1376 (1976). Almost one year after EPA published its final regulations, while this case awaited oral argument in this court, Congress amended the toxics provision of the 1972 Act in section 53 of the Clean Water Act of 1977 (1977 Amendments or the Amendments), 33 U.S.C.A. § 1317 (1977). Velsicol argues that the subsequent congressional action requires us to remand the toxic effluent standards for endrin for new proceedings under the 1977 Amendments. We do not agree. Courts apply the statutory law as it exists at the time of decision unless the intent of Congress is otherwise. Bradley v. School Board, 416 U.S. 696, 715-16 & n.21, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). We conclude that this is a case in which it was intended that the new legislation not affect regulations that were awaiting judicial review prior to enactment of the legislation. Compare In re District of Columbia Workmen's Compensation Act, 180 U.S.App.D.C. 216, 219-222, 554 F.2d 1075, 1078-81, Cert. denied, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976) With De Rodulfa v. United States, 149 U.S.App.D.C. 154, 161, 164-167, 461 F.2d 1240, 1247, 1250-53, Cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972).
 
 
 17
 Congress passed the 1972 Act in an effort to deal with the regulatory problems that had hindered efforts to control water pollution. EPA v. State Water Resources Control Board, 426 U.S. 200, 202-03, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). The 1972 Act solved some regulatory problems, but not others. By 1977, Congress concluded that the toxics provision of the 1972 Act, which provided for regulation based on health criteria, had been a failure.[13] As a reaction to inadequacy of the 1972 toxics provision, EPA commenced a new program to issue regulations under other provisions of the 1972 Act: it would regulate toxic discharges on an industry-by-industry basis and set standards based on the feasibility of control technology. EPA would also continue to issue health-based standards. EPA's new program was sanctioned by the judicial decree in NRDC v. Train, 8 ERC (BNA) 2120, 2122 (D.D.C.1976) ("Flannery decree"), Rev'd in part on other grounds sub nom. NRDC v. Costle, 183 U.S.App.D.C. 11, 561 F.2d 904 (1977). In the 1977 Amendments, Congress remodeled the toxics provision based on the judicial decree in NRDC v. Train.[14]
 
 
 18
 In section 53(a) of the 1977 Amendments, 33 U.S.C.A. § 1317(a)(2) (1977), Congress directed EPA to take into account, in issuing health-based regulations, "the extent to which effective control is being or may be achieved under other regulatory authority," particularly EPA's authority to promulgate feasibility-based regulations. See 33 U.S.C.A. § 1311(b)(2)(C) (1977). Velsicol contends that this provision shows that Congress intended EPA to withdraw the health-based toxics regulations promulgated under the 1972 Act, particularly the endrin regulations, and to regulate endrin discharges using feasibility-based criteria.[15] EPA responds that the 1977 Amendments were intended to supplement its authority, and were not intended in any way to impede promulgation of health-based regulations.
 
 
 19
 On a question of statutory interpretation such as this one, involving legislation enacted with EPA's advice and cooperation, EPA's view of the legislative intent concerning its ongoing efforts deserves some deference. See E. I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 134-35, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); Train v. NRDC, 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Congress knew that EPA's health-based regulations were in effect and were awaiting judicial review. See 123 Cong.Rec. H12929 (daily ed. Dec. 15, 1977) (staff report). Moreover, its attitude was not that EPA had done too much and should start all over, but rather that EPA had done too little. "Frankly, (Section 307(a)) has failed. . . . (O)nly six toxic chemicals aldrin/dieldrin, endrin, DDT, toxaphene, benzidene and PCB's Have been regulated. Six chemicals in 5 years." Id. at H12927 (remarks of Rep. Roberts) (emphasis added). Congress's strong support for continuing health-based regulation is shown not only by its impatience with EPA's pace, but also by the great emphasis placed in the 1977 Amendments on making it Easier for EPA to promulgate health-based regulations as a supplement to feasibility-based regulation. See 123 Cong.Rec. S19649 (daily ed. Dec. 15, 1977) (remarks of Sen. Muskie) ("these amendments reduce the evidentiary burden of establishing a toxic effluent standard"); S.Rep.No.370, 95th Cong., 1st Sess. 54 (1977); U.S.Code Cong. & Admin.News 1977, p. 4378 (lifting of formal rulemaking requirement for health-based regulation). The provision relied on by Velsicol merely directs EPA to "take into account" its "other regulatory authority"; it created no new threshold barrier in health-based regulation.[16] Senator Muskie stated that the test for regulating a pollutant under health-based criteria instead of feasibility-based criteria is simply whether "there is sufficient information on toxicity to establish a separate nationwide effluent standard for that pollutant." 123 Cong.Rec. S19649 (daily ed. Dec. 15, 1977).[17] EPA's lengthy and detailed final decision on endrin, 42 Fed.Reg. 2590-601, both demonstrates and supports its view that there is sufficient information on endrin to establish such a standard.
 
 
 20
 Velsicol emphasizes that Congress listed endrin among the sixty-five families of toxic substances in the 1977 Amendments. It maintains this must have been intended to require EPA to reconstruct its regulations under the feasibility-based provisions of the 1977 Amendments. However, the list of substances in the 1977 Amendments was modeled, in large measure, on the judicial decree in NRDC v. Train. See note 14 Supra. That decree expressly directed EPA to proceed with health-based regulation of endrin at the same time as it proceeded with feasibility-based regulation of other substances. 8 ERC (BNA) at 2128-29. The 1977 Amendments required, "at a minimum," section 307(a)(2), that EPA publish effluent limitations based upon best-available technology for all pollutants on the list; the list was in no way intended to preclude health-based standards if they were warranted. 123 Cong.Rec. S19663 (daily ed. Dec. 15, 1977) (remarks of Sen. Randolph).[18]
 
 
 21
 Thus, we conclude that the 1977 Amendments were intended to aid, not to impede, EPA's health-based regulation. In accordance with EPA's view that this intent would be frustrated if the regulations were nullified, we conclude that the applicable law in this proceeding is the 1972 Act and that no remand is necessary.III. SUBSTANTIVE ISSUES CONCERNING TOXAPHENE.
 
 
 22
 A. Claims of the Parties.
 
 
 23
 In setting discharge standards, EPA's approach was to follow a procedure consisting in essence of determining, in the laboratory, which aquatic organisms were most vulnerable to toxaphene, measuring how much toxaphene they could take, and then, using these data, calculating a maximum tolerable discharge figure. Hercules challenges EPA's laboratory-based approach, as well as particular details of EPA's methodology.
 
 
 24
 EPA's approach may be viewed as consisting of six steps. In the first, EPA selected a half-dozen species of aquatic organisms for testing that were either important commercially in and of themselves (oysters), or important indirectly as food for other organisms (pinfish).[19]
 
 
 25
 Second, EPA conducted "bioassays" in the laboratory. In these bioassays, EPA exposed the organisms to toxaphene for ninety-six hours.[20] EPA derived, from the bioassay results, the concentration of toxaphene that kills one-half of a group of aquatic organisms. The short-term lethal dose for the tested organisms ranged from 16 parts per billion for oysters to 0.5 parts per billion for pinfish. These figures reflect the vulnerability of fish and other aquatic life to toxaphene. Third, EPA estimated from the short-term lethal dose the maximum tolerable long-term concentration of toxaphene for the tested species.[21] Fourth, EPA used the long-term tolerable concentration level to set an "ambient water criterion." The ambient water criterion is intended to be the maximum concentration of the toxic substance allowed in the nation's waterways a concentration low enough that even the most vulnerable important life in the water will be safe.[22]
 
 
 26
 Fifth, EPA translated the ambient water criterion into the effluent discharge standard, the standard controlling how much toxaphene a plant may discharge legally.[23] Finally, EPA set a "mass limitation" to supplement the effluent discharge limit. Whereas the effluent discharge limit is expressed in terms of a concentration of toxaphene, the mass limitation restates it in terms of the total amount of toxaphene produced. Such a supplemental figure compels a plant to meet the effluent discharge limit by removing toxaphene from its effluent. In the absence of such a mass limitation, a plant could meet the discharge limit simply by watering down its effluent until the effluent was diluted enough to meet the concentration limit.
 
 
 27
 Hercules' challenge to EPA's laboratory-based approach relies on alternative data using field studies. Starting in 1970, Dr. Robert Reimold, a Georgia biologist, conducted a field study of aquatic life in Terry Creek, the arm of Brunswick Estuary into which Hercules' plant discharges effluent. For six years, Dr. Reimold compared the variety of free-swimming species found in Terry Creek with the variety found in Duplin Estuary, a comparable nearby body of water not contaminated by toxaphene. Dr. Reimold believed that toxaphene was not harming the free-swimming aquatic life present in Terry Creek. The level of toxaphene in Terry Creek's waters was between 1 and 2 parts per billion, which is between 200 and 400 times EPA's "ambient water criterion" of .005 parts per billion. Accordingly, Hercules asserts that aquatic life can survive higher levels of toxaphene than EPA allows, and thus, that EPA's regulations are overly strict.
 
 
 28
 Hercules combines this frontal assault with several attacks on the specifics of EPA's methodology. It contends that EPA's use of the pinfish as a test species was misconceived, since the pinfish is not an important species in Brunswick Estuary. It also argues that EPA's toxicity tests were conducted improperly, that the tests failed to support the standard with substantial evidence, and that EPA should not have adopted a mass limitation precluding dilution.
 
 
 29
 EPA replies that its six-step approach was proper, since the toxics provision requires "categorical" standards for toxic pollutants, rather than standards based on local species and local receiving waters. EPA further responds that it was not required to give great weight to Hercules' evidence, and that its own tests furnished an adequate basis for regulation.
 
 
 30
 B. Statutory Issues.
 
 
 31
 The court has discussed the standards of section 307(a), 33 U.S.C. § 1317(a) (1976), in EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 79-81. As explained there, section 307(a)(2) of the 1972 Act lists six factors for EPA to "take into account" in proposing a toxic effluent standard: "the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms." EPA is to set discharge standards that provide an "ample margin of safety." Section 307(a)(4). Under the "ample margin of safety" directive, EPA's standards must protect against incompletely understood dangers to public health and the environment, in addition to well-known risks. See EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 80-81.
 
 
 32
 Hercules' challenge to the regulations concentrates on the last three factors in section 307(a): "the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms." Hercules argues that these factors preclude EPA from basing its calculations upon experiments performed on the pinfish, and require it to focus exclusively on organisms actually found in the particular receiving waters into which Hercules discharges. EPA's testing scheme, Hercules contends, is "contrary to the statutory requirement that EPA design its standards to fit the characteristics of Specific water bodies in terms of 'the toxicity of the pollutant' In those waters and 'the importance of the affected organisms' In those waters." Brief of Petitioner Hercules at 59 (emphasis added).
 
 
 33
 We agree with EPA's interpretation of the statute. See, e. g., E. I. du Pont de Nemours & Co. v. Train, 430 U.S. at 134-35, 97 S.Ct. 965. As reported, the House version of the 1972 Act, H.R. 11896, 92d Cong., 2d Sess. § 307(a)(1) & (2) (1972) (emphasis added), contained a factor for toxic standards related to local conditions, as Hercules would prefer: "the usual or potential presence of the affected organisms In (The receiving ) Waters." The Senate version did not include any factors relating to "affected organisms." S. 2770, 92d Cong., 1st Sess. § 307 (1971). In conference, the House factors were accepted, but the phrase "in the receiving waters" was replaced by "in any waters." The Conference Report notes:
 
 
 34
 Sections 307(a)(1) and (2) are the same as the comparable provisions of the House amendment, except that the Administrator is required to take into account the usual or potential presence of the affected organisms In any water rather than in the receiving waters as is provided in the House amendment.
 
 
 35
 1 Senate Comm. on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972 (hereafter, Legislative History) at 312 (Comm.Print 1973) (emphasis added). Senator Muskie, a conference manager, explained that the substitution was a compromise to preserve the "categorical determination" established by the Senate in lieu of the focus on particular "receiving waters" in the House version:
 
 
 36
 With regard to toxic pollutant control, the Senate bill and the House amendment differed in provisions for determining whether a pollutant would, in fact, be toxic. The House amendment proposed that there be an examination of the effect of a pollutant on receiving waters to determine toxicity. The Senate bill established a general test in order to assure a categorical determination as to which pollutants were toxic and which were not. The Conference agreement provides specific tests for toxicity as proposed by the House But retains the categorical determination established by the Senate.
 
 
 37
 1 Legislative History at 173 (emphasis added).[24]
 
 
 38
 The Conference Committee's focus on a "categorical determination" rather than on specific "receiving waters" reflected a drafters' leitmotif in the 1972 Act.[25] Pre-1972 attempts at water pollution control had been based upon characteristics of local bodies of receiving water. For that reason, in part, they failed:
 
 
 39
 The earliest version of the Federal Water Pollution Control Act was passed in 1948 and amended five times before 1972. Throughout that 24 year period, Congress attempted to use receiving water quality as a basis for setting pollution standards. W. Rodgers, Environmental Law 355-57 (1977). At the end of that period, Congress realized not only that its water pollution efforts until then had failed, but also that reliance on receiving water capacity as a crucial test for permissible pollution levels had contributed greatly to that failure. EPA v. State Water Resources Control Board, 426 U.S. 200, 202, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).
 
 
 40
 Weyerhaeuser Co. v. Costle, 191 U.S.App.D.C. 309 at 340, 590 F.2d 1011 at 1042 (1978). The 1972 Act remedied that shortcoming by shifting its focus from difficult-to-measure conditions and benefits in local receiving waters to readily determinable categorical consideration.
 
 
 41
 Congress concluded that water pollution seriously harmed the environment, and that although the cost of control would be heavy, the nation would benefit from controlling that pollution. Yet scientific uncertainties made it difficult to assess the benefits to particular bodies of receiving water. . . . Under the new statutory scheme, Congress clearly intended us to avoid such problems of proof so that a set of regulations with enforceable impact is possible.
 
 
 42
 Id. at 337-340, 590 F.2d at 1039-1042. See also E. I. du Pont de Nemours & Co. v. Train, 430 U.S. at 127, 97 S.Ct. 965.
 
 
 43
 Applying a categorical approach, EPA did not limit its study to the aquatic life found in receiving waters for toxaphene discharges. Instead, EPA tested six important marine species, and from the results of these tests, it inferred the likely sensitivity of other species. Specifically, it chose the most sensitive species actually tested (pinfish), and used the test results from that species to set the ambient water criterion.
 
 
 44
 The choice of the most sensitive species actually tested may be understood on at least two levels. Legally, section 307(a)(4)'s fundamental instruction is that EPA's standards should provide an "ample margin of safety." Basing the scheme upon the most sensitive species actually tested provides a margin of safety for less sensitive species. Scientifically, the scheme rests upon a statistical assumption:
 
 
 45
 Reliable toxicity data exist for a relatively small percent of all organisms in the aquatic environment for any given substance. It seems a safe assumption to make, that as additional species are tested, some of them are going to be more resistant than those that have already been tested and some are going to be more sensitive. . . . If we consider the thousands of species of aquatic organisms which exist in our waterways and assume that only one hundred of these species are important enough to protect for the purpose of man's use; and if we further consider that perhaps only a half dozen species at most have been tested in most instances, it is highly probable that in any given water, species of greater sensitivity than those already tested, occur. Therefore, it would appear that the Use of the most sensitive species tested, to establish acceptable levels, may not be overly conservative, since so few species have been tested and more sensitive important species surely exist. Furthermore, should one of the food chain species be sensitive and essential, an entire food pyramid would be jeopardized.
 
 
 46
 App. I 255-56 (Affidavit of Dr. Donald I. Mount) (emphasis added).
 
 
 47
 C. Scope of Review.
 
 
 48
 The applicable scope of review is discussed in EDF v. EPA (PCBs ), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 82-83. EPA's determinations are subject to review under the "substantial evidence" test, which requires that EPA's conclusions be supported by "such relevant evidence as a reasonable mind might accept as adequate to support (the) conclusion(s)." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). When agency rulemaking is based on judgments "on the frontiers of scientific knowledge," this standard calls for deferential review of the agency's conclusions that "depend to a greater extent upon policy judgments." Industrial Union Department, AFL-CIO v. Hodgson, 162 U.S.App.D.C. 331, 338, 499 F.2d 467, 474-75 (1974).
 
 
 49
 In this case, we are called upon to review a Numerical standard for discharge. In reviewing a numerical standard, we must ask whether the agency's numbers are within a "zone of reasonableness," not whether its numbers are precisely right. See, e. g., FPC v. Conway Corp., 426 U.S. 271, 278, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976) (electric power rates); Permian Basin Area Rate Cases, 390 U.S. 747, 796-98, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (natural gas rates); New York v. United States, 331 U.S. 284, 344, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947) (rail rates); Bilingual Bicultural Coalition on Mass Media v. FCC, 193 U.S.App.D.C. 236 at 244, 595 F.2d 621 at 629 (1978) (en banc) (minority workforce statistics); Federation of Homemakers v. Schmidt, 176 U.S.App.D.C. 261, 264-65, 539 F.2d 740, 743-44 (1976) (food content standards). A principal rationale for the "zone of reasonableness" concept is that it frees the court from the minutiae of particular calculations, and correspondingly, it allows an agency discretion to adapt a general formula or methodology to the aspects of a particular case.
 
 
 50
 Hercules argues that EPA failed to respond adequately to, or to rebut, its showing on particular issues. We shall discuss these issues individually. However, as a preliminary matter, we observe that the toxics provision places the burden of persuasion (in the agency hearing) on the person urging modification of the proposed standard. "(U )Nless the Administrator finds, on the record, that a Modification of such proposed standard (or prohibition) is justified based upon a preponderance of evidence adduced at such hearings, such standard (or prohibition) shall be promulgated." Section 307(a)(2) (emphasis added).[26] Since Hercules urged EPA to modify the proposed standard (that is, to promulgate a more relaxed, revised standard), the burden of proof in the agency hearing was on Hercules, not EPA.[27]
 
 
 51
 D. Adequacy of the Basis for EPA's Regulations.
 
 
 52
 1. EPA's policy judgments.
 
 
 53
 Although EPA's categorical focus led it to favor a laboratory approach, that focus did not preclude consideration of field data. Indeed, it considered past fish kills, bird kills, human poisonings, and other incidents, 42 Fed.Reg. 2602-03, as well as Dr. Reimold's Brunswick Estuary studies, Id. at 2604-05. However, EPA concluded that, in this particular case, the Brunswick Estuary study should not be accorded much weight both because of the inherent limitations of such a study and because of the particular limitations on Dr. Reimold's technique. Id.
 
 
 54
 Hercules vigorously disputes EPA's conclusion about the Brunswick Estuary study. It argues that EPA failed to present evidence to rebut Dr. Reimold's study; that neither the Administrator, nor the judicial officer assigned to the proceeding, Ms. Harriet Marple, had sufficient scientific training to reject Dr. Reimold's approach; and, that the rejection of the field study was unsupported by substantial evidence.
 
 
 55
 The scientific uncertainty attending the choice is demonstrated dramatically by the different alternatives advanced by Hercules and EPA, each propounded by different scientists. The choice of a suitable technique for estimating toxicity risks is a decision "on the frontiers of scientific knowledge." The relative scientific and administrative advantages of different techniques are incapable of precise comparison by this court. Decision between the alternatives is a quintessential policy judgment within the discretion of EPA. We cannot accept Hercules' notion that the administrator of the agency created to protect the environment lacked even the Capability to exercise the discretion with which he was entrusted by Congress.
 
 
 56
 Hercules contends that EPA failed to "rebut" the Reimold study with testimony from experts in Dr. Reimold's field of expertise, ecological analyses. The short answer is that EPA had expert evidence on which it could, and did, base its refusal to credit Dr. Reimold's study with more weight.[28] Moreover, we would not impose on EPA a wooden requirement that when, as in this case, there is conflicting testimony from experts in different fields (here, toxicology and ecology), EPA may only accept the evidence from one field if it rebuts, point-by-point, the evidence from the other field. Certainly, EPA may compare evidence from different fields, and make a reasoned determination thereon. The issue is not whether EPA has substantial evidence from every scientific field, but whether it has substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); See FPC v. Florida Power & Light Co., 404 U.S. 453, 462-67, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972).
 
 
 57
 Further, we uphold EPA's decision to set a mass limitation restating its effluent discharge standard. See text at --- - --- of 194 U.S.App.D.C., at 103-104 of 598 F.2d Supra. EPA set a mass limitation in order that its effluent discharge standard would not be subverted; its standard would thus be met, not by dilution of effluent with uncontaminated water,[29] but by treatment of the effluent. The 1972 Act favors toxic substance abatement rather than dilution. Section 101(a)(3), 33 U.S.C. § 1251(a)(3) (1976) (emphasis added) expresses a "national policy that the discharge of toxic pollutants in toxic Amounts be prohibited." Obviously, this national policy will be frustrated if discharge of a toxic substance continues in the same amount, but merely in diluted form. During public hearings on the 1972 Act, then-Administrator Ruckelshaus testified that "we don't believe that the solution to pollution is dilution." 2 Legislative History at 1228. Congress accepted his position and "(t)he Conference substitute (for the Senate and House bills) specifically bans pollution dilution as an alternative to waste treatment." 1 Legislative History at 284.[30]
 
 
 58
 In this respect, we draw support from cases involving clean air legislation that rejected dilution and dispersion of pollutants as a means of compliance. See Kennecott Copper Corp. v. Train, 526 F.2d 1149, 1153-60 (9th Cir. 1975), Cert. denied, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); Big Rivers Electric Corp. v. EPA, 523 F.2d 16, 20-22 (6th Cir. 1975), Cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). See generally Hines, A Decade of Nondegradation Policy in Congress and the Courts: The Erratic Pursuit of Clean Air and Clean Water, 62 Iowa L.Rev. 643 (1977).
 
 
 59
 2. EPA's factual determinations leading to the numerical standard.
 
 
 60
 The Criteria Document prepared for EPA and affidavits presented by EPA and EDF summarized an array of studies and evidence concerning the toxicity (including carcinogenicity), persistence, and degradability of toxaphene. Toxaphene was shown to be toxic to phytoplankton, App. I 133, aquatic invertebrates, App. I 133-35, 292, fish, App. I 135-42, 293-345, fish-eating birds, App. I 142-43, and mammals, App. I 143-49.
 
 
 61
 Evidence was presented that toxaphene is carcinogenic. EPA summarized a study concluding that strobane, a substance related to toxaphene, causes cancer in mice. App. I 148. Preliminary data were presented indicating that toxaphene caused cancer in mice and rats. App. II 645-49. Toxaphene also was shown to cause enzyme induction. App. I 148.[31] On this record, EPA cautiously refrained from declaring toxaphene to be a carcinogen, in part because the data were to recent to make a complete scientific analysis. However, EPA concluded that "the existence of these data underscores the Agency's concern that discharges of toxaphene be minimized." 42 Fed.Reg. 2602.
 
 
 62
 EPA also produced physical and chemical evidence that toxaphene is persistent, mobile, and adsorbed to sediments, and biological evidence that toxaphene is not degraded and tends to bioaccumulate in aquatic species.[32] App. I 151-57, 249, 351.
 
 
 63
 Against this background, EPA conducted bioassays in order to derive a numerical discharge standard. Systematic comparable bioassays were conducted on six species, using a uniform methodology. App. I 346-54.
 
 
 64
 Hercules did not offer bioassays or other laboratory studies in opposition, but did criticize EPA's studies. Hercules contended in the administrative proceedings, as it does now, that the pinfish toxicity data were used to set the ultimate numerical standard, and that the pinfish bioassay was unreliable because the fish suffered artificial "stress," lowering resistance to toxaphene.[33] EPA disputes the claim of artificial stress. Brief for Respondent in 77-1248 at 40-41. Hercules also objects to EPA's reference on appeal to evidence of toxaphene's carcinogenicity, since EPA's own decision declined to make a finding of human carcinogenicity.
 
 
 65
 We find EPA's determination of the effluent discharge and mass limitation standards supported by substantial evidence and within the zone of reasonableness. As this court stated in Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 410, 541 F.2d 1, 38 (en banc), Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), "(b)y its nature, scientific evidence is cumulative: the more supporting, albeit inconclusive, evidence available, the more likely the accuracy of the conclusion." Although the pinfish bioassay played a significant role in setting the numerical standard, it should not be viewed in isolation. Its persuasive value was enhanced by prior studies of the similarity of many other aquatic species to toxaphene, and by bioassays using five other species performed contemporaneously. Although the support that other tests and studies lend to the standard is not as direct as that provided by the pinfish data, those tests and studies are mostly decidedly part of the agency's cumulative evidence. With respect to the allegations that EPA's pinfish bioassay was itself flawed (E. g., that the fish were under stress) these allegations were refuted by testimony. App. II 726-27.
 
 
 66
 Finally, we do not accept Hercules' contention that this court may not consider EPA's conclusion concerning carcinogenicity that the data "underscore ( ) the Agency's concern that discharges of toxaphene be minimized." The record contains data concerning toxaphene's carcinogenicity for animals.[34] Thus, EPA's limited conclusion, which articulates its "concern" about toxaphene's carcinogenicity, is supported in the record.[35] Although EPA did not make an affirmative finding of carcinogenicity, its concern was relevant to the setting of a standard providing an "ample margin of safety," and therefore relevant in this appeal. See EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 80-81.
 
 
 67
 IV. SUBSTANTIVE ISSUES CONCERNING ENDRIN.
 
 
 68
 A. Statutory Issues.
 
 
 69
 Velsicol's principal argument for invalidating the endrin standard is that EPA was required to give consideration to the feasibility of achieving the standard with existing pollution control technology, but failed to do so adequately. It contends that consideration of feasibility is required by "reasoned decision making" and principles of "rational" consideration. Velsicol maintains that the standard under review is, in fact, not achievable.[36] Velsicol refers to Bunker Hill Co. v. EPA, 572 F.2d 1286, 1301 (9th Cir. 1977), a case arising under the Clean Air Act, for the proposition that "(t)he record must establish that the required technology is feasible, not merely Possibly feasible."
 
 
 70
 EPA defends its standard on alternative grounds. It contends that section 307(a) simply does not require it to give any consideration to economic and technological feasibility. Reviewing the factors listed in that section, it points out that "(a)bsent from the list is any requirement that the Administrator consider technological feasibility or economic impact." Brief for Respondent in No. 77-1349 at 41. See also id. at 53 & n. 30. EPA also contends that the endrin standard is, in fact, feasible.[37] Id. at 53.
 
 
 71
 We agree with EPA's contention that section 307(a) does not require it to consider economic and technological factors. "(T)he starting point in every case involving construction of a statute is the language itself.' " Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). Section 307(a)(2) requires EPA to "take into account" six factors in proposing toxics standards that comprehensively cover the fate of toxic substances in the environment, their effects on living organisms in general, and their effects on some organisms present and important in particular.[38] EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 79-80. None of the six factors speaks explicitly to the technical means used to control the discharge of substances, nor is there present any term commonly used to denote a feasibility consideration, E. g., feasibility, achievability, practicability, economic impact, or cost. Cf. section 304(b)(1) & (2), 33 U.S.C. § 1314(b)(1) & (2) (1976) (speaking of practicability and achievability). Section 307(a) itself provides for consideration of no other factors. Cf. section 304(b)(1)(B) & (2) (B) & (4)(B), 33 U.S.C.A. § 1314(b)(1)(B) & (2)(B) & (4)(B) (1977) (EPA may take into account "such other factors as the Administrator deems appropriate.").
 
 
 72
 An examination of other provisions of the 1972 Act reinforces this interpretation of section 307(a). Section 307(a)(4) directs EPA to set standards providing "an ample margin of safety," without any mention of feasibility criteria. Further, we do not believe that section 307(a)(5) introduces feasibility criteria into the statutory scheme. Section 307(a)(5) states that "(w)hen proposing or promulgating any effluent standard (or prohibition) under this section, the Administrator shall designate the category or categories of sources to which the effluent standard (or prohibition) shall apply." The legislative history makes clear that categories would be differentiated not by the feasibility Vel non of pollution control, but by the extent to which a toxic substance is present in the industrial process.[39]
 
 
 73
 The legislative background explains why Congress focused on public and environmental protection, rather than discharge control technology, in the setting of toxic standards. The regulatory scheme is similar to that of the Clean Air Act Amendments of 1970, Pub.L.No. 91-604, 84 Stat. 1676, which distinguished between pollutants subject to technology-based regulation under section 111, and hazardous substances, subject to health-based regulation under section 112. Recognizing that "certain pollutants" required special treatment because of risk to health, Congress enacted section 112, dealing with hazardous pollutants, without provision for considerations of feasibility. 1 Senate Comm. on Public Works, 93d Cong., 2d Sess., A Legislative History of the Clean Air Act Amendments of 1970 (hereafter, Clean Air Legislative History) at 133 (Comm.Print 1974) (remarks of Sen. Muskie) (The Senate subcommittee on Air and Water Pollution "was presented with strong evidence that any level of emissions of certain pollutants may produce adverse health effects that cannot be tolerated." Id. at 227.).
 
 
 74
 The 1972 Act continued this distinction, adopting technology-based standards for pollutants in general and health-based standards for toxic pollutants. Compare sections 301 & 304(b), 33 U.S.C. §§ 1311 & 1314(b) (1976) With section 307(a). "The Committee considers that the discharge of toxic pollutants are much too dangerous to be permitted on merely economic grounds." 1 Legislative History at 800 (House Report). In light of this clear statutory wording and legislative history, it is not surprising that numerous commentators agree that considerations of technological and economic feasibility do not play a part in standard-setting for toxic substances.[40]
 
 
 75
 Velsicol argues that, if feasibility is not considered, the regulations will be promulgated at an irrationally strict level. However, the congressional selection of factors is a legislative determination that the need of the public and the environment for protection from toxic chemicals is more important than the problems of stringent regulation. This congressional determination is a rational response to the dangers presented by toxic substances. The meaning of the statute being clear, it is not this court's prerogative to impose considerations of feasibility. See Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); Union Electric Co. v. EPA, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).[41]
 
 
 76
 It may also be argued that, as a practical matter, it will prove very difficult to administer the statute without considering feasibility, because of the resistance of industry representatives and environmentalists to what will be perceived by them, respectively, as overly or underly stringent regulation. However, our interpretation, which follows in large part EPA's original interpretation of section 307(a), will not necessarily lead to great difficulty in administering the section, because it does not preclude EPA from gathering information about feasibility.[42] Availability of information about feasibility may tend to induce industry and environmentalists to accept standards based on health criteria.
 
 
 77
 Velsicol points out that EPA did consider feasibility in the proceedings leading to the regulations in issue. Indeed, Velsicol contends that EPA first set its endrin standard in accordance with feasibility criteria and then justified it with evidence related to the section 307(a)(2) factors. This argument raises the possibility that we must remand the agency's standards on the grounds that EPA took an erroneous step in its deliberations. See SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). However, upon careful examination of the manner in which EPA considered feasibility evidence, we conclude that a remand is unwarranted.
 
 
 78
 EPA's consideration of feasibility is more understandable in light of the history of toxics proceedings. In 1973 and 1974, EPA conducted proceedings for promulgating regulations under section 112 of the Clean Air Act and section 307(a). In both the air and the water proceedings, EPA expressly excluded from consideration evidence concerning the economics of pollution control, although it had gathered such evidence.[43] The 1973-74 toxics proceedings under section 307(a) ended in failure; EPA did not adopt toxic pollutant regulations. See EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 68-69 (discussing this period in detail). EPA's failure was partially due to its fear of "almost certain challenge in court." 41 Fed.Reg. 23577 (1976). Out of an abundance of caution, EPA altered its position after 1974 to allow limited consideration of feasibility. In part, it did so on the basis of judicial authority, since overruled, that directed it to consider feasibility in the context of another health-based statute.[44] EPA's position served to build an administrative record that could support its regulations on appeal if feasibility were ultimately held to be a factor under section 307(a).
 
 
 79
 We have concluded that section 307(a) does not include feasibility as a factor for consideration. However, the fact that EPA considered evidence about feasibility does not require that the regulations be vacated. It is apparent that EPA calculated its endrin standards using health-based, not feasibility-related, evidence.[45] It conducted bioassays of aquatic species, determined the maximum long-term dose of endrin that the most sensitive tested species could tolerate, set an ambient water criterion, and calculated effluent standards and mass limitations. Only then, upon calculating its standards, did it consider evidence about feasibility to provide an additional test. 42 Fed.Reg. 2597-600. It found that the standards were, in fact, feasible. Although consideration of feasibility is not contemplated by section 307(a), EPA's consideration of it did not affect its conclusions based on the factors specified by section 307(a), but constituted an attempt to confer additional legitimacy on its conclusions. The supererogatory consideration did not prejudice Velsicol in any way. Indeed, Velsicol actually gained an additional opportunity to press for relaxed standards by presenting evidence that the standards were not achievable.
 
 
 80
 We do not find support in the record or in the administrative decision for Velsicol's contention that EPA proceeded "backwards" in setting the endrin standards. Velsicol invites the court to probe the Administrator's mental processes in search of an alternative methodology for his decision other than the evidence and the reasons stated. We must decline this invitation. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).
 
 
 81
 B. Review of the Support for EPA's Policy Determinations.
 
 
 82
 Velsicol contests two of EPA's determinations in calculating the endrin standards. We review the record, keeping in mind that, when issues are "on the frontiers of scientific knowledge," the "substantial evidence" test calls for deferential review of EPA's policy judgments. Industrial Union Department, AFL-CIO v. Hodgson, 499 F.2d at 474-75. Both of Velsicol's contentions concern EPA's alleged failure to deal adequately with local aquatic organisms and local receiving water conditions at the site of Velsicol's plant in Memphis, Tennessee. We reject Velsicol's contentions for the reasons underlying our rejection of Hercules' argument that EPA was required to focus on conditions at the site of its Brunswick plant.
 
 
 83
 1. Application factor.
 
 
 84
 EPA used the same six-step technique in setting its endrin standard that it used in setting its toxaphene standard. See App. I 355-59. In considering toxicity, it summarized studies showing that endrin was toxic to a broad range of invertebrates, fish, birds, and mammals. App. I 94-107. Evidence concerning the carcinogenicity of endrin in mice and rats had been produced, 41 Fed.Reg. 31316-17 (1976) (establishing "rebuttable presumption" against continued registration of endrin as a pesticide) and new evidence concerning this was presented in these proceedings, 42 Fed.Reg. 2591-93.[46] Endrin was demonstrated to be persistent and mobile in some circumstances, and while it was sometimes degraded or eliminated, it was bioaccumulated in many organisms. App. I 108-17.
 
 
 85
 With this general data on toxicity, persistence and degradability as background, EPA compared the short-term lethal endrin doses for a number of important freshwater and marine organisms. Pink shrimp was the most sensitive species actually tested, with a short-term lethal dose of .037 parts per billion. To estimate a long-term safe dose for shrimp, EPA multiplied the short-term lethal dose by an "application factor" of .1, a figure derived from endrin tests on an invertebrate, one type of stonefly that is found in mountain streams. EPA then calculated the long-term safe dose for pink shrimp, and it set the ambient water criterion for endrin at .004 parts per billion. See 42 Fed.Reg. 2593-94.
 
 
 86
 Velsicol challenges EPA's use of shrimp toxicity data and stonefly application factor data. It notes that pink shrimp are not exposed to Velsicol's endrin discharges until the endrin travels over 700 miles along the Mississippi River to the Gulf of Mexico, and that stoneflies of this species are not exposed to Velsicol's discharges at all. See Brief of Petitioner Velsicol at 12-16. It argues that data were available for species that do live in the Mississippi, and that EPA should not have preferred the shrimp and stonefly data over data for species in the local receiving waters. As we discussed in connection with EPA's tests on pinfish in setting toxaphene standards, Congress intended that EPA would use categorical determinations in setting standards for toxic pollutants, rather than limit its consideration to species present in receiving waters. EPA's decision sets forth at length the reasons for selecting the shrimp and stonefly data as the basis for the standards. 42 Fed.Reg. 2593-94.[47] Choice among scientific test data is precisely the type of judgment that must be made by EPA, not this court. "It is in just such matters that the findings of (EPA), because of its experience and the assistance of its technical staff, should be accorded the greatest weight and the courts should be most hesitant to substitute their judgment for that of (EPA)." FPC v. Florida Power & Light Co., 404 U.S. at 466, 92 S.Ct. at 645 (quoting United States ex rel. Chapman v. FPC, 191 F.2d 796, 808 (4th Cir. 1951), Aff'd, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953)).
 
 
 87
 2. Mixing zone factor.
 
 
 88
 Once effluent is discharged, it mixes with the waters at the site of discharge. Having set an ambient water criteria for endrin of .004 parts per billion, EPA set an effluent discharge standard using a "mixing zone" factor. It employed a mixing factor of 375, anticipating that one part of effluent would be mixed with about 375 parts of water before aquatic organisms had significant contact with endrin.[48] As a backstop, EPA also provided for a "tightening variance" a smaller mixing zone factor for any discharges in waters where mixing is likely to be less thorough. 42 Fed.Reg. 2609, 2614-15. Velsicol contends that the evidence supports a larger mixing zone factor, up to 4,000 in view of the volume and flow of the Mississippi River, and that EPA must also provide for "loosening" variances (large mixing zone factors for thoroughly-mixed waters).
 
 
 89
 We sustain EPA's decision with respect to the mixing zone factor. The issue of mixing zones is a controversial one. One leading commentator on section 307(a) argued that the 1972 Act "probably does not allow mixing zones at all," since Congress banned pollution dilution as an alternative to waste treatment. K. Hall, The Control of Toxic Pollutants Under the Federal Water Pollution Control Act Amendments of 1972, 63 Iowa L.Rev. 609, 628 & n. 109 (1978).[49] On the other hand, Velsicol urges that EPA should take into account the full diluting capacity of the Mississippi, based on the volume, flow, geographical configuration, and other factors that go into calculations about particular receiving waters.
 
 
 90
 EPA's decision to use a moderate mixing zone factor and to make provision only for "tightening," not loosening, variances must be deemed a rational, although simple, compromise. By prescribing that EPA focus on categorical factors rather than on characteristics of local receiving waters, Congress sought to keep toxics regulation from becoming ensnarled in disputes over the characteristics of particular local waters, a complex matter Congress left to the setting of water quality standards under section 303, 33 U.S.C. § 1313 (1976).[50] Section 307 regulation was to focus on toxicity and related characteristics of pollutants. Accordingly, Congress left EPA to choose among the available approaches for translating toxicity data into end-of-pipe standards.[51] "An agency confronted with a complex task may rationally turn to simplicity in ground rules, and administrative convenience, at least where no fundamental injustice is wrought." American Public Gas Association v. FPC, 186 U.S.App.D.C. 23, 63, 567 F.2d 1016, 1056 (1977) (quoting Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 374, 435 F.2d 440, 446 (1970)).
 
 
 91
 Having chosen a methodology, the compromise figure set by EPA was rational. A much higher figure for the mixing zone might well have frustrated two congressional policies: that the "margin of safety" provided by the standards be "ample" and that pollution concentration be controlled by treatment, not dilution. We find that the choice of 375 as the mixing zone factor was within the "zone of reasonableness" and, within that zone, the choice of a precise figure is left to EPA.
 
 
 92
 V. PROCEDURAL ISSUES.
 
 
 93
 Hercules and Velsicol challenge EPA's procedures in two basic respects. First, they contend that the Administrator and the judicial officer impermissibly relied on submissions from, and engaged in contacts with, EPA staff. Second, Hercules argues that EPA committed reversible error in not issuing a tentative decision after the close of the evidence and before the final decision.
 
 
 94
 A. Applicable Standards Under the Administrative Procedure Act.
 
 
 95
 Petitioners maintain that EPA was required to follow the procedure set forth in section 5 of the Administrative Procedure Act (APA), 5 U.S.C. § 554 (1976). They support this contention basically by two arguments. First, section 307(a) states that the Administrator, after proposing standards, shall hold a "hearing" and that he shall make certain findings "on the record" of the hearing. Petitioners maintain that section 554 applies to all proceedings "on the record." See Reply Brief for Petitioner Hercules at 12-13. Second, petitioners argue that a "functional" analysis of these proceedings shows that EPA must follow section 554. We cannot agree.
 
 
 96
 Section 554 is entitled "Adjudications" and, by its express terms, applies in cases of "Adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554 (emphasis added). It is well settled that section 554 applies only in cases of adjudication, and not to rulemaking proceedings. Hoffmann-La Roche, Inc. v. Kleindienst, 478 F.2d 1, 13 (3d Cir. 1973); Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 692-94 (9th Cir.), Cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949). Thus, the issue before us is whether section 307(a) requires adjudication or rulemaking.
 
 
 97
 We commence our analysis with the APA definitions. "Adjudication" is defined in the APA as "agency process for the formulation of an order." 5 U.S.C. § 551(7) (1976). An "order" means "the whole or a part of a final disposition . . . in a matter other than rule making." 5 U.S.C. § 551(6) (1976). "Rule making" is defined as "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5) (1976). The entire definitional scheme of the APA therefore turns on the meaning of "rule."
 
 
 98
 The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4) (1976). Under the APA definition in section 551(4), the toxic pollutant standards now before us are "rules." The standards are designed to "implement" and "prescribe law" pursuant to the authority of the 1972 Act. See Willapoint Oysters, Inc. v. Ewing, 174 F.2d at 693. Moreover, the standards had solely "future effect"; they did not apply in any way to discharges prior to their promulgation, and, indeed, compliance was not required until January 12, 1978, one full year after they were published in final form. 42 Fed.Reg. 2612; 40 C.F.R. § 129.8(a) (1977). Thus, in the APA definitional scheme, section 307(a) standards are "rules," and not "orders"; the process is "rule making," and not "adjudication." Accordingly, section 554 is not applicable. See generally PBW Stock Exchange, Inc. v. SEC, 485 F.2d 718, 732-33 (3d Cir. 1973, Cert. denied, 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974); American Express Co. v. United States, 472 F.2d 1050, 1055, 60 CCPA 86 (1973). See also Automotive Parts & Accessories Association v. Boyd, 132 U.S.App.D.C. 200, 205, 407 F.2d 330, 335 n. 6 (1968). That section 307(a) provides a "hearing" and findings "on the record" is not in any way inconsistent with the view that it calls for rulemaking. Section 307(a)(2) begins by requiring EPA to propose a standard "in accordance with section 553 of title 5," which explicitly contemplates "Rules (that) are required by statute to be made On the record after opportunity for an agency Hearing." 5 U.S.C. § 553(c) (1976) (emphasis added).
 
 
 99
 Petitioners also contend that a "functional" analysis of these proceedings demonstrates that they involve adjudication. In our view, such an analysis is unavailing. As the Supreme Court stated:
 
 
 100
 The basic distinction between rulemaking and adjudication is illustrated by this Court's treatment of two related cases (Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) and Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)) under the Due Process Clause of the Fourteenth Amendment. . . . While the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.
 
 
 101
 United States v. Florida East Coast Railway, 410 U.S. 224, 244-45, 93 S.Ct. 810, 820, 35 L.Ed.2d 223 (1972).
 
 
 102
 The toxics provision contemplates "proceedings for the purpose of promulgating policy-type rules." Id. at 245, 93 S.Ct. at 821. The statutory provision requires EPA to consider issues of general policy with respect to a pollutant, I. e., the significance of its toxicity, degradability, persistence, and effects on affected organisms, rather than issues of fact concerning any particular entity's discharges. These inquiries are the same whether the substance is discharged by one manufacturer or one thousand. In short, as we discuss elsewhere, the statute calls for "categorical," not individual or local, determinations.
 
 
 103
 The fact that Velsicol is the sole domestic manufacturer of endrin affected by the standards (and that Hercules contends it is the sole domestic manufacturer discharging toxaphene) does not, Ipso facto, mandate the use of5 U.S.C. §§ 556 & 557 (1976), Anaconda Co. v. Ruckelshaus, 482 F.2d 1301, 1306-07 (10th Cir. 1973); Accord, South Terminal Corp. v. EPA, 504 F.2d 646, 660-01 (1st Cir. 1974); Law Motor Freight, Inc. v. CAB, 364 F.2d 139, 143 (1st Cir. 1966), Cert. denied, 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1967); See American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 317, 359 F.2d 624, 631, Cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966), or A fortiori of section 554. Moreover, even when only one manufacturer is subject to the standards, that manufacturer is not the only affected entity. The standards affect the multitude who fish, take drinking water, or otherwise, directly or indirectly, come in contact with waters containing the discharged toxic substance, all of whom may appear in proceedings. Toxic substances are mobile, and individuals far from the site of discharge may be exposed to them. Rulemaking, not adjudication, is the appropriate, flexible procedural mechanism to accommodate the input of all concerned. See Anaconda Co. v. Ruckelshaus, 482 F.2d at 1306. For these reasons, we agree with the comment in Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 878 n. 10 (1st Cir. 1978), cert. denied, 439 U.S. 824, 99 S.Ct. 94, 57 L.Ed.2d 117 (1978) (dictum) ("Of the determinations listed in § 509(b) (of the 1972 Act), only one must be on the record by the terms of the (Act). That one is § 307(a)(2) which is clearly rule making.")[52]
 
 
 104
 Indeed, section 307(a)[53] is not entirely clear about the extent to which EPA must employ formal, rather than informal, rulemaking procedures. United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 752, 756-57, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1952); Accord, United States v. Florida East Coast Railway, 410 U.S. at 234, 237-38, 93 S.Ct. 810; Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 247, 483 F.2d 1238, 1250 (1972). However, in these proceedings, EPA explicitly chose to provide petitioners with "formal rulemaking" procedures. 42 Fed.Reg. 2588. Consistent with its "formal rulemaking" approach, EPA, in this appeal, acquiesces in "substantial evidence" review. Brief for Respondent in No. 77-1248 at 24-25. In view of EPA's position, we need not comment further. See generally Aberdeen & Rockfish Railroad v. Students Challenging Regulatory Agency Procedures (SCRAP), 422 U.S. 289, 326-27 n. 28, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); See also Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978); United States v. Florida East Coast Railway, 410 U.S. at 236 n. 6, 93 S.Ct. 810.
 
 
 105
 B. Reliance by the Administrator on Staff Assistance.
 
 
 106
 1. Background.
 
 
 107
 Hercules and Velsicol challenge EPA's rules on the grounds that they are the result of impermissible reliance by the Administrator and the judicial officer on EPA's rulemaking staff in two respects: use of the staff's proposed findings and conclusions, and contacts between the staff and the judicial officer. We set forth the background of these issues in detail because the particular administrative and factual context governs our resolution.
 
 
 108
 As discussed more completely in EDF v. EPA (PCBs), 194 U.S.App.D.C. at ---, ---, 598 F.2d at 68-69, EPA's initial effort at rulemaking for PCBs, toxaphene, and endrin in 1973-74 ended in failure, frustrating Congress's express directive for rapid action. As Representative Roberts, a conference manager of the House version of the 1977 Amendments later remarked, "far and away the most severe single problem has been the formal, cumbersome rulemaking process." 123 Cong.Rec. H12927 (daily ed. Dec. 15, 1977). Accordingly, when EPA set out on a renewed effort at toxics regulation in 1976, it took particular care to avoid, within the procedural law existing at that time, unnecessary impediments that might lead to another rulemaking failure.
 
 
 109
 On January 12, 1976, EPA proposed changes in its procedural hearings on toxic pollutants. 41 Fed.Reg. 1766 (1976). The proposals relaxed in some measure the existing procedures for notices of hearing, prehearing conferences, taking of evidence, interlocutory review within the agency, and similar matters.
 
 
 110
 Among the numerous proposals was a change in the use of staff assistance. Proposed regulation 40 C.F.R. § 104.14(a) stated that "the Administrator, with such staff assistance as he deems necessary and appropriate, shall review the entire record and prepare and file a tentative decision based thereon." This regulation was intended to replace 40 C.F.R. § 104.16 (1975) known as the "Ex parte contacts rule" that had enjoined "the Administrator or the presiding officer (from) consult(ing) with any person or party on a fact at issue."[54]
 
 
 111
 Twenty-eight persons (including Hercules) commented on the proposed rules. 41 Fed.Reg. 17899 (1976). EPA adopted the proposed staff assistance rule, and in response to comments it had received, set out the following:
 
 
 112
 Several commenters opposed the proposed deletion of the prohibition on Ex parte discussions appearing in the original rules at Section 104.16. The Agency proposed to delete this section for the reason that the prohibition on such Ex parte conversations, which is applicable to adjudication, is inapplicable to rulemaking. The Agency cited considerable case law in support of this point. Although several of the commenters cited decisions which they claim supported a contrary view, each of the cases cited involved adjudication rather than rulemaking, and are hence inapplicable. The comments submitted by Kaiser Aluminum and Chemical Corporation cite K. Davis Administrative Law Treatise, Section 13.00 at 453 (1970 Supp.). Davis is at the point discussing the separation of prosecutorial and decision-making functions within an administrative Agency, which is closely related to the Ex parte question since the issue with respect to Agency personnel is whether the staff who presents the evidence should be precluded from discussing the regulation with the Administrator out of the presence of the objector's representatives. Although Professor Davis equivocates on what the policy should be, he leaves no doubt about the law: "The conclusion seems to be rather solid that no law requires the Commissioner (of FDA) to separate functions in rulemaking for which on-the-record hearings are required". Id. p. 443.
 
 
 113
 The rationale for not imposing separation of functions, and the attendant prohibition on communication between those responsible for developing and presenting the proposed rule or standard and the person ultimately charged with promulgation, lies with the nature of rulemaking. The development of a proposed rule or standard includes a number of policy decisions in which many program offices within the agency participate. The Administrator relies on the advice and recommendations of these offices in developing and proposing the standards. At the same time, persons within these offices may well present evidence at rulemaking hearings including information on which the proposed standard was based. It would be counterproductive to reasoned rulemaking if, at the stage of final decision and promulgation, the administrator were isolated from those within the Agency whom he normally consults on policy determinations and whose offices will be charged with implementation and enforcement of the regulations. The institutional nature of the Administrator's decision, as noted previously, is inherent in the very nature of rulemaking, and is normally absent from adjudication.
 
 
 114
 Because the law clearly does not require the prohibition on Ex parte discussions contained in Section 104.16 as originally promulgated, and because nothing in the rulemaking process warrants its retention, it is deleted as proposed.
 
 
 115
 Id. at 17902.
 
 
 116
 EPA conducted the proceeding now on review under the new procedural rules. Its chief judicial officer, Ms. Harriet B. Marple, was assigned to aid the Administrator in preparing his final decision. Ms. Marple was confronted with a loosely organized rulemaking record of enormous detail and staggering complexity thousands of pages of highly technical testimony, affidavits, and studies from a variety of sources to be considered against an uncertain scientific and legal background. The record had been closed on October 12, 1976. Under the judicial decree in NRDC v. Train, 8 ERC (BNA) at 2122, and under the deadline imposed by section 307(a)(2), the Administrator had two months or less to issue his final standards.
 
 
 117
 In an affidavit for the court, Ms. Marple stated that, when she was assigned to assist in this matter, she met with G. William Frick, then-General Counsel of EPA, and Ridgway M. Hall, then-Associate General Counsel, Water, to discuss whether, in the course of her efforts, consultation with EPA experts was permissible. Mr. Frick advised her that the APA "did not bar such Ex parte contacts within the Agency, in rulemaking proceedings," and that she was allowed to "consult with Agency experts to assist in reviewing the record, whether or not the experts had participated as witnesses in the hearing." Affidavit of Ms. Harriet B. Marple, dated March 22, 1978 (hereafter, Marple affidavit) at 1.
 
 
 118
 Ms. Marple described the ensuing intra-agency contacts as follows:
 
 
 119
 To the best of my recollection, I consulted with the following EPA employees, and with no other persons, in preparing the Final Decision:
 
 
 120
 (1) I consulted with Russell E. Train, who was at the time of the Final Decision Administrator of the Environmental Protection Agency.
 
 
 121
 (2) I consulted with Ridgway M. Hall, Associate General Counsel, Water, Lorraine Chang, Attorney, Water Quality Division, Office of General Counsel and Maren Michelet, Paralegal Specialist, Water Quality Division, Officer of General Counsel, when I needed assistance in locating documents in the record (where, for example, the proposed findings and conclusions of the parties contained incorrect citations). I did not discuss factual or policy issues related to the case with any of these persons.
 
 
 122
 (3) I consulted with Dr. Leonard Guarraia, Chief, Criteria Branch, Criteria and Standards Division, Office of Water and Hazardous Materials. I discussed the toxicological issues which were raised by the record with Dr. Guarraia.(4) I consulted with Dr. Joel L. Fisher, of EPA's Office of Research and Development, on species diversity indices. I discussed the record evidence regarding species diversity with Dr. Fisher. I explained to Dr. Fisher that I could not consider extra-record material, because my decision had to be confined to the record, but that I wanted his assistance in understanding the record. During one of our discussions Dr. Fisher gave me a package of materials. In the course of preparing this affidavit, I searched for the materials which Dr. Fisher had given me. I found an unsigned document entitled "Affidavit", purporting to be the work of Joel L. Fisher. I recall that Dr. Fisher handed me this document during one of our meetings, I am certain that I did not consider the materials Dr. Fisher gave me in the preparation of the Final Decision.
 
 
 123
 In the course of preparing this affidavit, I have reviewed a memorandum at the request of Agency Counsel, subject: "Dr. Robert Reimold's Testimony on Toxaphene Before the Toxic Substances Hearings, P.L. 92-500, Section 307(a) on May 24, 1974," from Joel L. Fisher to Alan W. Eckert. I do not recall having seen this memorandum at any time during the preparation of the Final Decision. I have searched my files, and can find no indication that I ever received a copy of this memorandum. In any event, I am certain that I did not use it in the preparation of the final decision.
 
 
 124
 (5) I informed Steffen M. Plehn, who at the time was Executive Assistant to the Administrator, Russell E. Train, of the issues in the proceeding.
 
 
 125
 To the best of my knowledge, Administrator Train had no discussions with anyone except me or his Executive Assistant, Steffen M. Plehn, concerning the substance of these proceedings.
 
 
 126
 In the process of preparing the Final Decision, I relied exclusively upon the record certified by the Administrative Law Judge. I reviewed the entire record, and checked all record citations in the briefs and proposed findings of the parties. Every finding and conclusion in the Final Decision is supported by evidence in the rulemaking record. I consulted with the Agency personnel listed in paragraphs (3) and (4) above for the sole and limited purpose of properly understanding and interpreting this record. I did not rely upon any extra-record material.
 
 
 127
 Id. at 2-4.
 
 
 128
 In January 1977, the Administrator issued his final decision. Two months later, this court decided Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 567 F.2d 9 (per curiam), Cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), which addressed Ex parte contacts with agency decisionmakers. Hercules then moved to serve interrogatories concerning the manner in which the Administrator's decision was made.[55] A motions panel referred the motion to the panel of the court assigned to hear the case.[56] In response to a request by the court that it be advised at oral argument concerning EPA staff contacts, on the day of oral argument EPA submitted the affidavit of Ms. Marple. Subsequently, the parties submitted supplemental memoranda addressing the issues raised by the Marple affidavit.[57] On these particular facts and in this particular statutory context, we uphold EPA.
 
 
 129
 2. Administrator's reliance on proposed findings and conclusions.
 
 
 130
 Petitioners contend that the final decision resembles closely the proposed findings and conclusions submitted by EPA's staff. They maintain that such resemblance evidences impropriety.
 
 
 131
 Except in cases where there is no accompanying explanation of the reasons underlying an administrator's decision, See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 417-19, 91 S.Ct. 814, "(a) strong presumption of regularity supports the inference that when administrative officials purport to decide weighty issues within their domain they have conscientiously considered the issues. . . ." Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 406, 379 F.2d 453, 460 (1967); Accord, United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); National Nutritional Foods Association v. FDA, 491 F.2d 1141, 1145-46 (2d Cir.), Cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). Thus, it generally is " 'not the function of the court to probe the mental processes' " of an agency decisionmaker. United States v. Morgan, 313 U.S. at 422, 61 S.Ct. at 1004 (quoting Morgan v. United States,304 U.S. 1, 18, 58 S.Ct. 999, 82 L.Ed. 1129 (1937)); Accord, Montrose Chemical Corp. v. Train, 160 U.S.App.D.C. 270, 275-278, 491 F.2d 63, 68-71 (1974); Braniff Airways, Inc. v. CAB, 379 F.2d at 460, 462; See National Courier Association v. Board of Governors of Federal Reserve System, 170 U.S.App.D.C. 301, 314, 516 F.2d 1229, 1242 (1975). See also K. Davis, Administrative Law of the Seventies, §§ 11.00, 11.04 (1976). This presumption can be overcome, and further explication can be required of the decisionmaker, only upon a strong showing of bad faith or improper behavior. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 420, 91 S.Ct. 814.
 
 
 132
 There is no question that the final decision provided a very detailed set of findings. The mere fact that the final decision was largely in accord with the staff's position does not, without more, establish that the Administrator considered only the staff view and not others. See Willapoint Oysters, Inc. v. Ewing, 174 F.2d at 689, 692-96. See also National Nutritional Foods Association v. FDA, 491 F.2d at 1144-46.
 
 
 133
 The speculative possibility that the Administrator accepted the staff view, not because he was persuaded by the evidence, but for some improper reason, fails to overcome the strong presumption of regularity. To accept petitioner's invention to pierce the presumption on this basis would be to alter radically the nature of judicial review.
 
 
 134
 3. Contacts between judicial officer and rulemaking staff.
 
 
 135
 Petitioners' contention that the contacts between the judicial officer and the agency staff were improper is most troubling. Recently, this court has twice held that particular ex parte contacts between private parties and agency decisionmakers in rulemaking were improper. United States Lines, Inc. v. FMC (Euro-Pacific), 189 U.S.App.D.C. 361, 584 F.2d 519 (1978); Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. at 142, 567 F.2d at 9. This Court has held that Other ex parte contacts between private parties and agency decisionmakers in rulemaking were Not improper. Action for Children's Television v. FCC, 183 U.S.App.D.C. 437, 564 F.2d 458 (1977). None of these cases concerned intra-agency staff contacts.[58]
 
 
 136
 At the outset, we reject any notion that the Administrator or the judicial officer proceeded in bad faith. The contacts here in no way involved a cabal-like arrangement within the agency. To the contrary, the contacts were permissible under procedural rules adopted by EPA in 1976 after public comment and legal debate. The validity of those rules was argued fully, and their justification was set out in detail. In formulating the procedural rules, EPA relied upon the unquestioned authorities of that time both classic cases in this field and broader matter collected in Professor Davis's treatise. The staff contacts under those rules were neither furtive, nor improvidently devised. They were arranged after a conference between the agency's chief judicial officer and its chief legal officials, whose advice was based upon existing case law and agency rules. While we must now decide whether that advice and those rules were sound in light of subsequent developments, our consideration of this issue does not impeach the good faith with which EPA proceeded.
 
 
 137
 Second, an examination of the Marple affidavit demonstrates that the Administrator and the judicial officer did not consider or rely on any evidence presented outside the record. The judicial officer stated that she prepared the final decision under the Administrator's supervision and direction; that she "relied exclusively upon the record certified by the Administrative Law Judge"; and that she "did not rely on any extra-record material." Marple affidavit at 1, 4. Two documents not in the record, one proffered and one possibly proffered to the judicial officer, were simply not considered. Consultations with staff Counsel (as opposed to non-legal experts) occurred when the judicial officer needed assistance in locating documents and did not concern factual or policy issues. Id. at 2. Consultation with staff experts was limited to reviewing the record. We have examined the final decision, this affidavit, and the contentions of the petitioners, and we cannot question, on this basis, the judicial officer's unqualified and detailed averments. Thus, this case is distinctly not one in which evidence outside the record was considered by the Administrator without being subject to challenge or rebuttal by the parties. See Seacoast Anti-Pollution League v. Costle, 572 F.2d at 880-82; Doe v. Hampton, 184 U.S.App.D.C. 373, 392-397, 566 F.2d 265, 284-89 (1977) (Robinson, J., dissenting.)
 
 
 138
 In Home Box Office, this court held that the wide-ranging Private contacts with the FCC decisionmakers that had occurred were impermissible. The parties here urge us to decide whether Staff contacts with agency decisionmakers are also impermissible. Petitioners contend that staff contacts offend the principles underlying the Home Box Office decision no less than private contacts. In their view, staff contacts deprive the reviewing court of the full and accurate administrative record, Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. at 187-88, 567 F.2d at 54-55; foreclose the opportunity for genuine adversarial discussion among the parties, Id. 185 U.S.App.D.C. at 188-89, 567 F.2d at 55-56; and, most importantly, are inconsistent with fundamental notions of fairness implicit in due process and with the ideal of reasoned decisionmaking, Id. 185 U.S.App.D.C. at 189, 567 F.2d at 56. They stress that this proceeding was more adversarial and formal than the informal rulemaking proceeding reviewed in Home Box Office.
 
 
 139
 EPA responds that, in the APA, Congress expressly sanctioned staff contacts, in contrast to private contacts, because of the quasi-legislative nature of the rulemaking process and the necessities of implementation of administrative policy. 5 U.S.C. § 554(d)[59] prohibits staff contacts in adjudi cation; 5 U.S.C. §§ 553, 556 & 557[60] do not express a similar prohibition in rulemaking.
 
 
 140
 These statutory provisions are discussed in the legislative history, which demonstrates that Congress decided that the strictures of 5 U.S.C. § 554(d) should not extend to rulemaking proceedings. The Senate Report for the APA, S.Rep.No.752, 79th Cong., 1st Sess. 17-18 (1945) states:
 
 
 141
 The exemption of applications for initial licenses frees from the requirements of the subsection (5 U.S.C. § 554(d)) such matters as the granting of certificates of convenience and necessity which are of infinite duration, upon the theory that in most licensing cases the original application may be much like rule making. The latter, of course, is not subject to any provision of section 5 (5 U.S.C. § 554).
 
 
 142
 The House Report for the APA, H.R.Rep.No.1980, 79th Cong., 2d Sess. 14 (1946) U.S.Code Cong.Serv. 1946, p. 1202 states:
 
 
 143
 Various agencies objected to any provision for the separation of functions in rule making . . . a suggestion which the present bill carries even further because section 5 which contains the segregation provision does not apply to rule making and in subsection (c) makes additional exemptions.
 
 
 144
 The Attorney General's Manual on the Administrative Procedure Act (hereafter, Manual ), which is due some deference because of the role played by the Justice Department in drafting the APA, Vermont Yankee Power Corp. v. NRDC, 98 S.Ct. at 1213 & n. 19, states that:
 
 
 145
 (not) only were the draftsmen and proponents of the bill aware of this realistic distinction between rule making and adjudication, but they shaped the entire Act around it. Even in formal rule making proceedings subject to sections 7 and 8, the Act leaves the hearing officer entirely free to consult with any other member of the agency's staff. . . . In sharp contrast is the procedure required in cases of adjudication subject to section 5(c) (5 U.S.C. 554(d)). . . . (I)n such adjudicatory cases, the agency officers who performed investigative or prosecuting functions in that or a factually related case may not participate in the making of decisions.
 
 
 146
 Manual at 15.[61] This legislative history has been construed consistently to allow the agency's rulemaking staff to assist agency administrators in interpreting the rulemaking record.[62] Further, the Supreme Court's decision in Vermont Yankee Nuclear Power Corp. counsels restraint in imposing procedural requirements beyond the letter of the APA.
 
 
 147
 This case presents issues of great sensitivity, involving constitutional questions, precedent that is difficult to reconcile, and a host of critical considerations. Consistent with our duties, we must not rule on such issues unless and until the concrete elements of the case so demand. For two reasons, we have determined that EPA's standards must be upheld in this particular context; the broader questions posed by the parties are reserved for another day.
 
 
 148
 First, both the adoption by EPA of its procedural rules and the issuance of the final decision preceded Home Box Office. In Action for Children's Television, Inc. v. FCC, 183 U.S.App.D.C. at 453, 564 F.2d at 474, this court considered the strong reliance of administrative agencies and the public on established precedent and specifically "h(e)ld only that Home Box Office's broad proscription is not to be applied retroactively in the case Sub judice inasmuch as it constitutes a clear departure from established law." Because EPA relied expressly on established precedent in promulgating its hearing rules, the holding of Action for Children's Television applies with particular force.
 
 
 149
 Second, the administrative history under section 307(a) created a peculiar context wherein the necessity for staff contacts existed with unusual and compelling force. As we have noted, section 307(a) sets forth rigid and compressed timetables. Previous EPA failures to meet these timetables resulted in a judicial decree fixing the time for rulemaking. NRDC v. Train, 8 ERC (BNA) at 2128. These congressional and judicial time restraints were imposed to minimize the period during which the public and the environment would be exposed to toxic substances. The administrative delay would not only have been contrary to law, but would also have increased exposure to hazardous substances. In view of the extraordinary bulk and complexity of the administrative record, a judicial officer attempting to digest the record and prepare a decision in a matter of weeks would face, at the least, great difficulty in proceeding without staff assistance.[63] Thus, this context invokes the rule of ancient origin that expedition in protecting the public health justifies less elaborate procedure than may be required in other contexts. See, e. g., Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); Adams v. Milwaukee, 228 U.S. 572, 584, 33 S.Ct. 610, 57 L.Ed. 971 (1913); North American Cold Storage Co. v. Chicago, 211 U.S. 306, 319-20, 29 S.Ct. 101, 53 L.Ed. 195 (1908). See also United States v. Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).[64] We may question, in passing, the manner in which the requisite expert assistance was secured, but we cannot dispute its necessity.[65]
 
 
 150
 Accordingly, we uphold EPA because the contacts only concerned assistance in understanding the record, EPA proceeded in good faith, section 554(d) is clearly inapplicable, Home Box Office does not apply retroactively, and the particular statutory and administrative context made rapid action by EPA necessary to carry out congressional mandates for the protection of public health and the environment.
 
 
 151
 Notwithstanding our decision, however, we feel compelled to record our uneasiness with one aspect of this case the communication between Ms. Marple and EPA staff legal advocates (Mr. Hall and Ms. Chang). The fact that the attorneys who represented the staff's position at the administrative hearing were later consulted by the judicial officer who prepared the final decision possibly gives rise to an appearance of unfairness, even though the consultations did not involve factual or policy issues. During congressional deliberation on the APA, the flexibility of rulemaking procedures was of concern, as the bill's sponsor indicated:
 
 
 152
 Mr. President, as I have pointed out before, this bill is designed to operate as a whole, and its provisions are closely interrelated. At the same time, it should be pointed out that here are certain provisions which touch upon subjects long regarded as of the highest importance. On some of these subjects, such as the separation of examiners from the agencies they serve, there has been a wide divergence of views. The committee has, in such cases, taken the course which it believes will suffice, without being excessive. Amendatory or supplementary legislation can supply any deficiency which experience discloses in such cases. The committee believes that special note should be made of these situations:
 
 
 153
 The exemption of rule making and determining applications for licenses, From provisions of sections 5(c) (5 U.S.C. § 554(d)), 7(c), and 8(a) May require change if, in practice, it develops that they are too broad. The committee believes it has followed sound discretion in selection of the language used, and it is the feeling of the committee that, where cases present sharply contested issues of fact, agencies should not as a matter of good practice take advantage of the exemptions (in 5 U.S.C. § 554(d)(A)-(C)).
 
 
 154
 92 Cong.Rec. 2159 (1946) (remarks of Sen. McCarran) (emphasis added); S.Rep.No.752, Supra, at 30; Accord, id. at 5652 (remarks of Rep. Walter).
 
 
 155
 Amendatory legislation may be justified if agencies do not themselves proscribe post-hearing contacts between staff Advocates and decisionmakers in formal rulemaking proceedings, lest there be an erosion of public trust and confidence in the administrative process. As we have discussed, until 1976, EPA banned intra-agency contacts in hearings such as these. EPA lifted this ban in 1976 in response to a peculiar situation of past failure and current necessity. Now might be a particularly propitious time for Congress or the agencies to limit or provide disclosure of post-hearing contacts between staff advocates and decisionmakers. See American Telegraph & Telephone Co. v. FCC, 449 F.2d 439, 453-54 & n.16 (2d Cir. 1971); K. Davis, Administrative Law Treatise, § 13.00 (Supp.1970).
 
 
 156
 C. Omission of the Tentative Decision.
 
 
 157
 Hercules maintains that EPA committed reversible error by not issuing a tentative decision. In this connection, Hercules asserts, and EPA does not now contest, that 5 U.S.C. § 557(b) (1976) is applicable. Section 557(b) provides that if, as in this case, the Administrator did not preside at the reception of evidence, either the employee who did preside shall issue a recommended decision, or the Administrator may issue a tentative decision himself. Section 557(b)(2) further provides that the Administrator may omit the tentative decision if he finds on the record that "due and timely execution of (his) functions imperatively and unavoidably so requires." EPA's procedural rules contain a very similar provision, but add that "due and timely execution of his functions, include(s) compliance with time limitations established by law." 40 C.F.R. § 104.14(c) (1977).[66] In his decision, the Administrator found explicitly that "the preparation and filing of a tentative decision . . . should be omitted," because "the filing of (the) decision had been delayed past the statutory deadline and past the deadline stipulated in the consent agreement in NRDC v. Train." 42 Fed.Reg. 2588.
 
 
 158
 As we have seen, section 307(a) was a dramatic congressional attempt to limit immediately and certainly the discharge of highly toxic substances into the nation's waterways. In attempting to cope with what was perceived as a particularly acute problem, Congress mandated a strict timetable for EPA. Thus, section 307(a) contained two directives to EPA that were difficult to reconcile. On one hand, section 307 was "saddled with extraordinary procedural preliminaries." W. Rodgers, Environmental Law 481 (1977). On the other hand, Congress legislated a precise timetable for the Administrator's promulgation of standards for toxics based on an unmistakable concern for the immediacy of implementation of the scheme.[67]
 
 
 159
 Unfortunately, experience proved that EPA was unable to meet the congressionally imposed timetable. See EDF v. EPA (PCBs), 189 U.S.App.D.C. at --- - ---, 598 F.2d at 68-69. For purposes of this discussion, we need note only two aspects of EPA's experience. First, by 1976, when EPA proposed the toxaphene standards now under review, it was already years behind schedule in every respect. Second, suit had already been brought against the Administrator to compel immediate action under section 307(a). The result of those suits was a judicially approved consent agreement under which
 
 
 160
 The Administrator (was to) propose standards pursuant to Section 307(a) of the Act for aldrin/dieldrin, DDT (DDD, DDE), endrin, and toxaphene on or before May 31, 1976; and for benzidine on or before June 22, 1976; and for polychlorinatal biphenyls (PCB's) on or before July 14, 1976. Not later than six months following proposal of each set of such standards, the Administrator (was to) promulgate final standards for each of such pollutants.
 
 
 161
 NRDC v. Train, 8 ERC (BNA) at 2128-29.[68] Thus, with respect to toxaphene, EPA was required under the current decree to promulgate standards before the end of 1976. EPA proposed new toxaphene standards on June 10, 1976, 41 Fed.Reg. 23576, held its formal rulemaking hearing from July 19 to October 12, and filed its final decision on January 3, 1977. There was no tentative decision. 42 Fed.Reg. 2588.
 
 
 162
 In our view, the presence of the statutory deadline and the consent decree deadline amply justify the Administrator's actions. The rulemaking in this case was characterized by voluminous submissions, a complex subject matter, and highly contested issues against the backdrop of judicial and statutory deadlines. As a practical matter, to issue and receive meaningful comment on a tentative decision is a process that would necessarily require time. EPA faced a choice among three basic possibilities: (1) to abridge the hearing process and the preparation of the final decision; (2) to miss the deadlines by a significant margin;[69] or (3) to omit the tentative decision. Absent substantial prejudice to Hercules, the Administrator was entitled to make the third choice.[70] Hercules alleges that it was prejudiced because it had no prior indication of EPA's position with respect to the Reimold study. Even assuming Arguendo that EPA's position on that matter required a further round of argument by Hercules, Hercules could have sought reconsideration by EPA. Spanish International Broadcasting Co. v. FCC, 128 U.S.App.D.C. 93, 99, 385 F.2d 615, 621 (1967); Albertson v. FCC, 87 U.S.App.D.C. 39, 41, 182 F.2d 397, 399 (1950); Accord, United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, 389, 56 S.Ct. 797, 80 L.Ed. 1209 (1936) (Brandeis, J., concurring); See ICC v. Jersey City, 322 U.S. 503, 515-18, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). See also Bowman Transportation, Inc. v. Arkansas Best Freight, 419 U.S. 281, 294-96, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); National Association of Trailer Owners v. Day, 112 U.S.App.D.C. 53, 299 F.2d 137 (1962).
 
 
 163
 We do not wish to be understood as condoning omission of the tentative decision in situations wherein agency laggardness creates an imminent danger that statutorily or judicially prescribed deadlines will not be met. We are satisfied here, however, that on this record omission of the tentative decision does not warrant reversal.
 
 
 164
 VI. COMPLIANCE TIME.
 
 
 165
 Under the 1972 Act's regulatory scheme, EPA sets discharge standards under the various statutory sections, and the standards are then incorporated into permits issued to dischargers which permit the maximum amount of pollutants that may be discharged. However, a special exception to this scheme is made in the area of toxic pollutant regulation. "Compliance with a permit issued pursuant to this section shall be deemed compliance (with the statutory standards) . . . except any standard imposed under (section 307) for a toxic pollutant Injurious to human health." Section 402(k) of the Act, 33 U.S.C. § 1342(k) (1976) (emphasis added). Thus, dischargers must meet newly established toxics standards even before their permits have been (or may be) revised to include them.[71] EPA contends this provision applies to its toxaphene and endrin standards. Hercules responds that toxaphene is not "injurious to human health" within the meaning of the statute, because the current level of toxaphene discharges is not creating a human health hazard. Velsicol also argues that the one-year compliance period should be extended because section 53(b) of the Clean Water Act of 1977, 33 U.S.C.A. § 1317(a)(6) (1977) allows EPA to set a longer time for compliance than the maximum specified in the 1972 Act (if it determines that compliance within that time is technologically infeasible for a category of sources).
 
 
 166
 We reject petitioners' arguments and uphold EPA's requirement of swift compliance with the newly set toxics standards. The 1972 Act is replete with declarations that swift compliance with toxics standards is the normal, not the exceptional, circumstance that petitioners would make it. Section 307(a)(6) provides that "(a)ny effluent standard (or prohibition) established pursuant to this section shall take effect on such date or dates as specified in the order promulgating such standard, but in no case, more than one year from the date of such promulgation." As the legislative history of the 1972 Act explains:
 
 
 167
 Because of the hazards posed by toxic substances, the committee considers the need for compliance with promulgated standards for toxic substances to be especially urgent. Language in section (307(a)(6)) is thus intended to convey that one year be an Absolute maximum time allowed for compliance with standards promulgated under this section, and that compliance be required As early as possible within this limit.
 
 
 168
 2 Legislative History at 1479 (Senate Report) (emphasis added). This command is reinforced by the declaration of purpose in section 101(a)(3) of the Act, 33 U.S.C. § 1251(a)(3) (1976), that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." This policy, in contrast to others declared in section 101(a), was intended to be implemented rapidly. See note 67 Supra. Because of EPA's failure to carry out Congress's mandate for rapid action concerning toxics, See EDF v. EPA (PCBs), 189 U.S.App.D.C. at --- - ---, 598 F.2d at 68-69, it is easy to lose sight of Congress's original intention that toxics be dealt with quickly. However, we will not interpret the 1972 Act as though delay in toxics control were an acceptable result.
 
 
 169
 Hercules points out that the term "injurious to human health" must have been intended to distinguish some toxic substances that are "injurious" from others that are not. It contends that since all toxic substances are likely to be "injurious" in some amount, for the term to make a meaningful distinction, it must require proof that the toxic substance creates a human health hazard in the amount now being discharged.[72] EPA concluded that a less restrictive view of the term would make it meaningful. As EPA interpreted the statute, the test should be whether the toxic substance would injure humans in "relatively small quantities." 42 Fed.Reg. 2601.[73]
 
 
 170
 We adopt EPA's interpretation. Nowhere in the Act's approach to toxics is there any requirement that EPA determine what quantities of a toxic substance are now being discharged. Hercules' view would require EPA to investigate and determine local discharge conditions, while EPA's view allows a categorical approach to toxicity measurements similar to that used in section 307(a). See Text accompanying notes 23-27 Supra. Velsicol's argument based on the Clean Water Act of 1977 is similarly unpersuasive. The fact that the Clean Water Act of 1977 gave EPA discretionary authority to allow a longer compliance time does not necessarily imply or suggest that the pre-existing maximum one-year period was always to be considered excessively stringent.
 
 
 171
 VII. CONCLUSION.
 
 
 172
 For the foregoing reasons, we uphold EPA's regulations setting standards for discharges of endrin and toxaphene.
 
 
 173
 So ordered.
 
 
 
 [1]
 Section 307(a) of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1317(a) (1976), provides as follows:
 (1) The Administrator shall, within ninety days after (October 18, 1972), publish (and from time to time thereafter revise) a list which includes any toxic pollutant or combination of such pollutants for which an effluent standard (which may include a prohibition of the discharge of such pollutants or combination of such pollutants) will be established under this section. The Administrator in publishing such list shall take into account the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms.
 (2) Within one hundred and eighty days after the date of publication of any list, or revision thereof, containing toxic pollutants or combination of pollutants under paragraph (1) of this subsection, the Administrator, in accordance with section 553 of title 5 of the United States Code, shall publish a proposed effluent standard (or a prohibition) for such pollutant or combination of pollutants which shall take into account the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms, and he shall publish a notice for a public hearing on such proposed standard to be held within thirty days. As soon as possible after such hearing, but not later than six months after publication of the proposed effluent standard (or prohibition), unless the Administrator finds, on the record, that a modification of such proposed standard (or prohibition) is justified based upon a preponderance of evidence adduced at such hearings, such standard (or prohibition) shall be promulgated.
 (3) If after a public hearing the Administrator finds that a modification of such proposed standard (or prohibition) is justified, a revised effluent standard (or prohibition) for such pollutant or combination of pollutants shall be promulgated immediately. Such standard (or prohibition) shall be reviewed and, if appropriate, revised at least every three years.
 (4) Any effluent standard promulgated under this section shall be at that level which the Administrator determines provides an ample margin of safety.
 (5) When proposing or promulgating any effluent standard (or prohibition) under this section, the Administrator shall designate the category or categories of sources to which the effluent standard (or prohibition) shall apply. Any disposal of dredged material may be included in such a category of sources after consultation with the Secretary of the Army.
 (6) Any effluent standard (or prohibition) established pursuant to this section shall take effect on such date or dates as specified in the order promulgating such standard, but in no case more than one year from the date of such promulgation.
 (7) Prior to publishing any regulations pursuant to this section the Administrator shall, to the maximum extent practicable within the time provided, consult with appropriate advisory committees, States, independent experts, and Federal departments and agencies.
 The Federal Water Pollution Control Act Amendments (1972 Act or the Act) were codified at 33 U.S.C. §§ 1251-1376 (1976). Section 307(a) was amended by section 53 of the Clean Water Act of 1977, 33 U.S.C.A. § 1317(a) (1977).
 
 
 [2]
 I Encyclopedia Britannica (Micropedia) 215 (1974) (definition of aldrin, a related substance)
 
 
 [3]
 See Notice of Rebuttable Presumption Against Registration and Continued Registration of Pesticide Products Containing Endrin, 41 Fed.Reg. 31316 (1976)
 
 
 [4]
 The toxicity of endrin, and the fish kills caused by its agricultural use, are not a new phenomenon and are discussed in R. Carson, Silent Spring 26-27, 139-40 (1962)
 
 
 [5]
 Velsicol Chemical Corp. (Velsicol) appealed the terms of the permit. Velsicol Chemical Corp. v. Train, No. 76-2568 (6th Cir. filed Dec. 6, 1976)
 
 
 [6]
 The Environmental Protection Agency (EPA) disputes Hercules, Inc.'s (Hercules) contention, but the issue is not one we need resolve. Hercules is the only manufacturer that has sought review of the toxaphene regulations
 
 
 [7]
 Experiments on the effects of endrin on fresh water organisms were done at another EPA laboratory
 
 
 [8]
 The administrative law judge's function in this proceeding consisted of compiling a complete record for the EPA Administrator (Administrator), without making an initial decision or recommendation. See 42 Fed.Reg. 2588 (1977)
 
 
 [9]
 There was no tentative decision. Id
 
 
 [10]
 On the basis of information concerning the volume of water discharged during production of endrin and toxaphene, the Administrator determined that the appropriate mass limitations corresponding to the proposed (and final) concentration limitations were 0.0006 kg/kkg for endrin and 0.00003 kg/kkg for toxaphene. 42 Fed.Reg. 2594, 2606
 Mass limitations are expressed as kilograms of discharged toxic substance, per thousand kilograms of manufactured toxic substance. For example, a mass limitation of .01 kg/kkg requires that a manufacturer discharge no more than .01 kilogram for every thousand kilograms it manufactures. The mass limitation is expressed this way to allow manufacturers to produce as much or as little of the substance as they wish without affecting their proportionate duty to purify the discharge.
 
 
 [11]
 EDF v. EPA, No. 77-1001 (D.C.Cir. June 17, 1977) (order granting unopposed motion for voluntary dismissal)
 
 
 [12]
 Order of Sept. 28, 1977
 
 
 [13]
 A number of Congressmen involved in the drafting of the amendments for the toxics provision commented on the inadequacy of the 1972 provision. 123 Cong.Rec. H12927 (remarks of Rep. Roberts), H12940 (Rep. Clausen), H12944 (Rep. Johnson) (daily ed. Dec. 15, 1977). Senator Muskie summed up the congressional mood:
 Toxics have not been dealt with effectively by this Congress under any piece of legislation we have eve(r) enacted into law. Never, never. . . .
 I am getting a little fed up myself, having written environmental laws for 15 years, to keep picking up the paper and reading about a new toxic that is killing more people, that is making more people ill because I have not done my job.
 
 
 [123]
 Cong.Rec. S13565 (daily ed. Aug. 4, 1977) (remarks concerning a related matter involving dredging)
 
 
 [14]
 As Senator Randolph observed, "(t)he legislation follows the settlement agreement (in that case) in listing 65 pollutants and families of pollutants and declaring that each such pollutant is toxic." 123 Cong.Rec. S19663 (daily ed. Dec. 15, 1977)
 
 
 [15]
 Velsicol contends that under the amended version of section 307(a), 33 U.S.C.A. § 1317(a) (1978):
 (1) the Administrator must first consider whether effective control can be obtained through the use of the best available technology economically achievable before promulgating a stricter standard; and
 (2) if a stricter standard than that obtained by use of the best available technology economically achievable is required to provide effective control, the Administrator must consider the technological feasibility of such stricter standard in determining the compliance data.
 Supplemental Memorandum of Velsicol Chemical Corp. on the Clean Water Act Amendments of 1977 at 2-3.
 
 
 [16]
 Cf. Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 384, 541 F.2d 1, 12 (en banc), Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (threshold requirement of factual findings for air pollution regulation); 42 U.S.C.A. § 7408 (1977) (same). See also 49 U.S.C.A. §§ 1(5) & (15) (1978) (requiring ICC to make finding of market dominance before determining reasonableness of railroad rates). That "other regulatory authority" should not be a threshhold barrier is consistent with congressional intent concerning multiple regulatory authorities for toxics. EDF v. EPA (PCBs), 194 U.S.App.D.C. ---, at --- - ---, 598 F.2d 62 at 76-78 (1978)
 
 
 [17]
 This test is a logical one for whether "effective control is being or may be achieved under other regulatory authority." If sufficient toxicity data exist to establish a health-based standard, that data show that a less stringent, feasibility-based standard would not provide sufficient control, and assures that the health-based regulatory mechanism has the tool it requires adequate data
 
 
 [18]
 Congress expressly authorized health-based standards. 33 U.S.C.A. § 1317(a)(2) (1977) provides, in part:
 The Administrator, in his discretion, may publish in the Federal Register a proposed effluent standard (which may include a prohibition) establishing requirements for a toxic pollutant which, if an effluent limitation is applicable to a class or category of point sources, shall be applicable to such category or class only if such standard imposes more stringent requirements.
 
 
 [19]
 The species selected by EPA were the oyster, the longnose killifish, the pink shrimp, the grass shrimp, the sheepshead minnow, and the pinfish. 42 Fed.Reg. 2601. For reasons discussed at --- - --- of 194 U.S.App.D.C., at 106 of 598 F.2d Infra, EPA did not limit its selection to species present or potentially present in Brunswick Estuary, or in other waters into which toxaphene is discharged, but used an array of important marine species
 
 
 [20]
 One of the species was exposed for twenty-eight days instead of ninety-six hours
 
 
 [21]
 Using a method developed by the National Academy of Sciences in 1972, EPA estimated that an aquatic organism could tolerate, over the long term, about one one-hundredth of the dose of toxaphene that would kill it over the short term. By this estimation method, the long-term safe concentration of toxaphene ranged from .16 parts per billion for oysters to .005 parts per billion for pinfish. 42 Fed.Reg. 2603-04
 
 
 [22]
 Of the important species actually tested by EPA, the pinfish proved to be most sensitive. For water to be tolerable to pinfish over the long term, it must not contain more than .005 parts per billion of toxaphene. EPA employed the maximum safe toxaphene concentration for the pinfish as its ambient water criteria because the pinfish was the most sensitive species actually tested. Accordingly, the ambient water criteria was set at .005 parts per billion. Id
 
 
 [23]
 EPA set the discharge level on the assumption that, after discharge into a body of water, concentrated effluent is mixed naturally and quickly with water. EPA assumed that few aquatic organisms are exposed to the concentrated discharge, while most will face only a mixed, attenuated toxaphene solution. In this case, EPA considered it reasonable to expect that such post-discharge mixing would attenuate toxaphene effluent by a factor of 300. Therefore, EPA set an average daily effluent discharge limit of 1.5 parts per billion, since that would produce, after attenuation through mixing by a factor of 300, an ambient water level of .005 parts per billion. Id. at 2605-06
 
 
 [24]
 Velsicol quotes Senator Muskie's discussion of the Clean Water Act of 1977, which refers indirectly to toxicity-based section 307(a) standards as being derived from characteristics of particular receiving waters. 123 Cong.Rec. S19649 (daily ed. Dec. 15, 1977). We do not consider this discussion to be a reliable guide about toxicity-based section 307(a) standards. In 1977, the issue on which Senator Muskie focused was the distinction between toxicity-based limitations and technology-based standards. That discussion was not intended, and should not be interpreted, as an explanation of how toxicity-based standards are set. In 1972, the precise issue Resolved by the Conference Committee was how to reach toxicity-based standards, and this distinction in methodology was then in the forefront. Accordingly, we deem the 1972 legislative history to be more reliable on this issue
 
 
 [25]
 The legislative history for the Senate bill reflected the Senate's determination not to focus on local conditions. "Such substances as heavy metals should be controlled on an absolute rather than on a regional waste management basis." 2 Senate Comm. on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments (hereafter, Legislative History) at 1496 (Comm.Print 1973) (discussion of definition of toxic pollutant)
 Whether this general legislative theme applies to section 311 of the 1972 Act, as amended, 33 U.S.C.A. § 1321 (1977), is the subject of dispute. Compare Manufacturing Chemists Ass'n v. Costle, 455 F.Supp. 968 (W.D.La.), Appeal docketed, No. 78-2697 (5th Cir. Aug. 9, 1978) With United States v. Boyd, 491 F.2d 1163, 1166-69 (9th Cir. 1973) And Ward v. Coleman, 423 F.Supp. 1352, 1357-59 (W.D.Okl.1976). In any event, section 307(a) contains no language comparable to that of section 311 concerning "times, locations, circumstances, and conditions." 33 U.S.C.A. § 1321(b)(4) (1977).
 
 
 [26]
 Without discussing the wording of 307(a)(2), Velsicol argues that, since 5 U.S.C. § 556(d) (1976) places the "burden of proof" on the proponent of a rule; EPA, not industry petitioners, has the burden of proof in these proceedings. However, the same contention by Velsicol was rejected previously. EDF v. EPA (Heptachlor and Chlordane), 179 U.S.App.D.C. 43, 58-60, 548 F.2d 998, 1013-15 (1977) (supplemental opinion on petition for rehearing). 5 U.S.C. § 556(d) allocates only the burden of production. The substantive statute, not the Administrative Procedure Act, allocates the burden of persuasion. Id. The placement of the burden of persuasion by section 307(a) (2) is clear, and is parallel to equally clear placement in section 112 of the Clean Air Act Amendments of 1970, 42 U.S.C.A. § 7412 (1977) (current codification). See 1 Senate Comm. on Public Works, 93d Cong., 2d Sess., A Legislative History of the Clean Air Amendments of 1970 (hereafter, Clean Air Legislative History) at 195-97 (Comm.Print 1974) (Conference Report)
 
 
 [27]
 This issue did not arise in EDF v. EPA (PCBs) because, in that case, both the private parties and EPA sought major modifications of the proposed standard
 
 
 [28]
 EPA based its judgment about the Reimold study upon Dr. Reimold's testimony on cross-examination, and upon Dr. Guarraia's testimony, Dr. Guarraia's testimony, in turn, was based in part upon other scientific analysis of the Reimold study. App. II 684-88. A critical problem EPA uncovered in the Reimold study was that Hercules' past pollution had settled into the bottom of Terry Creek, making it impossible for Dr. Reimold to study bottom-dwelling (benthic) aquatic life to see the effects of present pollution on such life. "(A)s you might imagine, there wasn't anything live in that ooze." App. III 1073 (testimony of Dr. Reimold about the polluted bottom of Terry Creek). See 42 Fed.Reg. 2605
 
 
 [29]
 As Hercules states, a mass limitation requires that its waste water stream meet the effluent limit before dilution of the waste water with uncontaminated cooling waters. Brief for Petitioner Hercules at 17
 
 
 [30]
 Velsicol notes accurately that then-Administrator Ruckelshaus made this statement in the context of a matter unrelated to toxics: the acceptability of the "low-flow augmentation" technique, in which stored waters are released into rivers during the dry season in order to make it easier to achieve water quality standards year-round. Reply Brief for Petitioner Velsicol at 14-15 (citing 2 Legislative History at 1228-29). However, the Administrator's statement, and Congress's acceptance of it, expressed a general view not limited to that matter
 
 
 [31]
 The nature of enzyme induction, and its relevance to carcinogenicity, are discussed in EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, 598 F.2d at 87-88
 
 
 [32]
 The meaning of these terms, and their relevance to the section 307(a)(2) factors, are discussed in EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- - ---, --- - ---, 598 F.2d at 79-80, 85-90
 
 
 [33]
 Hercules raises further challenges about minor details of EPA's arithmetic calculations. We find these meritless
 Hercules also contends that EPA failed to support its use of an "application factor" of one-hundredth (I. e., its derivation of the level of toxaphene safe for aquatic organisms in the long run by multiplying by one one-hundredth the level of toxaphene that kills aquatic organisms in the short run). We reject this argument for the same reasons we uphold the application factor determination for endrin. See --- - --- of 194 U.S.App.D.C., 114-115 of 598 F.2d Infra. The decision on such technical matters is peculiarly within the Administrator's expertise.
 
 
 [34]
 App. I 148; App. II 645-49
 
 
 [35]
 During the agency proceedings, EDF contended that the toxaphene standards were underprotective in view of the data on carcinogenicity. EDF's petition for review was dismissed on voluntary motion, See note 11 Supra, and therefore, we have no occasion to review any issues except those raised by Hercules
 
 
 [36]
 EPA concluded that the standards could be achieved by use of any of three technologies, or a combination of two of them. The three technologies are reductive degradation, activated carbon adsorption, and resin adsorption. In reductive degradation, a catalyst is used to render the endrin in the waste water harmless by replacing its chlorine with hydrogen. In the two adsorptive methods, waste water passes over an adsorbent substance (either activated carbon, which has been used for similar purposes in cigarette filters, or a synthetic resin) to which the endrin binds. The endrin is later flushed out of the adsorbent material with an appropriate solvent and disposed of separately. 42 Fed.Reg. 2595-600
 Velsicol contends that there are no actual operating data to show that resin adsorption is feasible, App. II 592-93; that early data on reductive degradation show that it operates undependably, E. g., App. II 773-86; and that activated carbon adsorption lacks the power to achieve EPA's strict standard, App. II 599-600; App. III 817-18.
 
 
 [37]
 Velsicol contends that EPA erred in reaching a conclusion of "achievability" on the basis of unperfected control technology that is, EPA erred in projecting what control technology might be able to do. Velsicol in essence would have EPA base a finding of "achievability" only on the basis of technology whose effectiveness has been proven. In Velsicol's view, "achievability" means that which is currently practicable. See Bunker Hill Co. v. EPA, 572 F.2d 1286 (9th Cir. 1977). EPA defines "achievability" differently. It considered achievability "on the basis of reasonable expectations as to technological feasibility." 42 Fed.Reg. 2597
 In order to choose between these conflicting legal standards and thus reach EPA's factual determinations, we would first have to undertake the same analysis of the role of "achievability" in the statutory scheme that we undertake in the text. For this reason, we must consider issues discussed in the text, rather than proceeding first to review EPA's factual determinations.
 
 
 [38]
 These factors are "the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms." Section 307(a)
 
 
 [39]
 Less stringent standards for an industry will not be established simply because it is more expensive to treat wastes to eliminate or reduce toxic discharges in one industry than in another. The Committee considers that the discharge of toxic pollutants are much too dangerous to be permitted on merely economic grounds
 
 
 [1]
 Legislative History at 799-800 (House Report)
 The Committee has provided the Administrator with authority to differentiate among categories of sources in establishing requirements under this section.
 This authority, for example, would give the Administrator the latitude to treat a plant that processes cadmium ore differently than he might treat a plant in which cadmium appears as a trace impurity. A similar ability to differentiate exists in the Clean Air Act.
 
 
 [2]
 Legislative History at 1479 (Senate Report)
 The Clean Air Act provision conferring the "ability to differentiate" among categories was included out of a recognition that, in some industrial processes, toxic substances played a major part, and that it was therefore appropriate to enforce a standard even if it closed down the industry, while, in other processes, toxic substances played a minor part, and it would be inappropriate to extend standards to such industries:
 The Committee recognizes that some of these hazardous pollutants, such as cadmium and beryllium, are present in nearly all raw materials. Thus, beryllium and cadmium appear as trace impurities in steel making and other raw material processes, in addition to the processing at beryllium and cadmium plants. Recognizing that complete control of beryllium from steel plants, for example, may not be necessary or practicable, the Committee has provided the Secretary with authority to differentiate among categories of sources in establishing prohibitions under section 115.
 Clean Air Legislative History at 420 (Senate Report).
 
 
 [40]
 W. Rodgers, Environmental Law 483-84 (1977); Zener, The Federal Law of Water Pollution Control, in E. Dolgin & T. Gilbert, Federal Environmental Law 710 (1974); K. Hall, The Control of Toxic Pollutants Under the Federal Water Pollution Control Act Amendments of 1972, 63 Iowa L.Rev. 609, 642-45 (1978); LaPierre, Technology-Forcing and Federal Environmental Protection Statutes, 62 Iowa L.Rev. 771, 798-99 (1977). See generally R. Hall, The Evolution and Implementation of EPA's Regulatory Program to Control the Discharge of Toxic Pollutants to the Nation's Waters, 10 Nat.Res.Law. 507, 511 & n. 12 (1977)
 
 
 [41]
 In Train v. NRDC, 421 U.S. 60, 91, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), the Supreme Court explained that certain sections of the Clean Air Act imposed requirements of a "technology-forcing character." In Union Electric Co. v. EPA, 427 U.S. 246, 257, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), the Court elaborated that such statutes "are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible." See generally LaPierre, supra note 40
 
 
 [42]
 In EPA's first proceedings under the hazardous air pollutant and toxic water pollution provisions, it gathered evidence about costs of achieving the standards, although it did not consider that evidence in setting the standards. See note 43 Infra. As a contemporaneous interpretation of the Act, we accord EPA's view considerable deference. See SEC v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 1716, 56 L.Ed.2d 148 (1978) (Brennan, J., concurring) (citing Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933)). EPA's view was that such information served functions such as informing Congress about the implementation of the Act, and informing the executive branch about inflationary impacts and similar matters. See Sections 507(e) & 509(a)(1), 33 U.S.C. §§ 1367(e) & 1369(a)(1) (1976)
 The history of proceedings under the statutory provisions concerning standards for hazardous air pollutants shows that the parties have frequently acquiesced in EPA's standards, or settled any differences before completion of judicial review. See, e. g., EDF v. Train, No. 76-2045 (D.C. Cir. June 24, 1977) (unreported dismissal of petition for review of vinyl chloride regulations); standards in note 43 Infra (regulations for asbestos, beryllium, and mercury not challenged in court). We welcome measures that may help to avoid the necessity of judicial review, and thus may further the administration of this statute. It may well be that in toxics proceedings, industry will find little to gain in refusing to acquiesce in standards when information shows that they are achievable, and environmentalists, not desiring to erode public support for toxics regulation, will find little to gain in refusing to acquiesce in standards when information shows that stricter standards would not be readily achievable. In this respect, information on feasibility serves a valuable function.
 
 
 [43]
 38 Fed.Reg. 8822 (1973) (atmospheric asbestos standard); Id. at 8824 (atmospheric beryllium standard); Id. at 8825 (atmospheric mercury standard); Id. at 35389 (proposed aquatic standards for aldrin and dieldrin, benzidine, cadmium, cyanide, DDT, endrin, mercury, PCBs and toxaphene)
 
 
 [44]
 41 Fed.Reg. 23577 (1976). EPA's principal case authority was Buckeye Power, Inc. v. EPA, 481 F.2d 162, 168-69 (6th Cir. 1973), which required EPA to consider technological feasibility in approving state Clean Air Act plans, even though that Act did not include feasibility as a consideration. The holding of Buckeye Power was subsequently overruled on this issue in Union Electric Co. v. EPA, 427 U.S. at 254, 96 S.Ct. 2518
 After Union Electric Overruled EPA's principal prior case authority, EPA sought to justify consideration of feasibility by adducing new arguments. 42 Fed.Reg. 2596. We have considered these arguments and do not deem them to affect our result.
 
 
 [45]
 EPA stated in its final decision:
 Yet the statutory "ample margin" concept is an elastic one which, like the importance of the organism, allows for considerable exercise of judgment by the Administrator in setting the standards. In any case where a discharge is allowed, on the spectrum ranging from certain safety (a prohibition) to that uncertain point where harmful effects are caused and safety ends, a logical break point is struck where the very best that control technology can do is required.
 
 
 [42]
 Fed.Reg. 2597; 41 Fed.Reg. 23580. This language suggests EPA contemplated setting its standard, in some instances, not by the six-step procedure, but by determining what level was achievable and accepting that "logical break point" as to the standard. In this instance, however, EPA calculated its standard using the six-step procedure before it turned to consideration of feasibility. See 42 Fed.Reg. 2588-89 (describing overall procedure), 2590-94 (describing the derivation of the ambient water criterion), 2605-06 (describing application of the mixing zone factor)
 
 
 [46]
 During the agency proceedings, EDF contended that this data on carcinogenicity showed EPA's endrin standard to be underprotective. EDF's petition for review was dismissed on voluntary motion, See Note 11 Supra, and, therefore, we have no occasion to review any issues except those raised by Velsicol
 
 
 [47]
 In light of the statutory factors that require EPA to consider, along with general toxicity, the nature and extent of effects on affected organisms, particularly important ones, EPA considered it most important to protect the pink shrimp from harm inflicted by endrin. Since the pink shrimp is an invertebrate, EPA found it more appropriate to use an application factor derived from stonefly data than from fish data, since the stonefly is an invertebrate
 
 
 [48]
 EPA's choice of a similar mixing zone factor for toxaphene is discussed in 42 Fed.Reg. 2605-06. To yield an ambient water criterion of .004 parts per billion for endrin, EPA used a factor of 375, arriving at an effluent discharge standard of 1.5 parts per billion. See 42 Fed.Reg. 2594 n. 1
 
 
 [49]
 "Mixing zones may not be appropriate for all effluents. Certain toxic chemicals which are bioaccumulatory and persistent in the environment, such as PCB's, should not be assigned mixing zones . . . . Other toxic chemicals which pose threats to human health by being carcinogenic, mutagenic, or teratogenic should not be assigned mixing zones." EPA Memorandum on Water Quality Standards Guidelines Chapter 5, at 16 (1976), Record entry 137 at 5-16
 
 
 [50]
 As general support for the mixing zone concept, EPA relied on an affidavit by an expert, App. I 263-66, and excerpts from Environmental Studies Board of the National Academy of Sciences National Academy of Engineering, Water Quality Criteria 1972 112-15, 403-07, 443-44 (1972), App. I 267-78. Velsicol contends that EPA should have based its mixing zone factor on the methods of calculation discussed in the report of the Environmental Studies Board and in Velsicol's expert's testimony. App. II 638. However, the title of the Environmental Studies Board report, as well as its contents, indicate the complicated calculation methods it discusses were directed only at water quality standards, I. e., standards under § 303 of the Act, 33 U.S.C. § 1313 (1976)
 Insofar as the treatment of such matters in water quality standard-setting was intended to be more thorough than in categorical pollutant-by-pollutant regulation under section 307(a), we find no error in EPA's using only the general notion of mixing zones in section 307(a) proceedings and not the elaborate water quality calculation methods. We do not believe that our view will lead EPA to use mixing zone factors for incorporating miscellaneous factors in its formulae. If EPA believes that the standards resulting from its six-step calculation are too high or too low because of considerations such as the relative strength (or weakness) of particular toxicity data, the importance of particular affected organisms, and similar matters set forth in section 307(a)(2), it should adjust its standards by an appropriate coefficient, rather than by altering the mixing zone factor. Otherwise, uncertainty will be engendered by the use of different mixing zone factors for toxic substances with similar properties.
 
 
 [51]
 Such approaches include "total mass" approaches, in which EPA would determine the total level of a toxic substance that may be discharged by all the dischargers consistent with an "ample margin of safety," and would then apportion that total by rationing or emission charge methods, and In situ bioassay approaches, in which the agency would determine what living organisms must be able to survive in a sufficiently uncontaminated manner at the sites of discharges. See EDF v. EPA (PCBs), 194 U.S.App.D.C. at --- note 79, 598 F.2d at 84 note 79
 
 
 [52]
 Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 878 n. 10 (1st Cir. 1978), cert. denied, 439 U.S. 824, 99 S.Ct. 94, 57 L.Ed.2d 117 (1978) (No. 77-1624) concluded that the Act intended that EPA hold Formal adjudications for some determinations even though the Act did not use the term "on the record" in referring to those determinations. One strand of the court's analysis was that section 509(b) of the Act contemplates formal adjudications by EPA, yet the only statutory provision listed in section 509(b) that uses the term "on the record" is section 307(a)(2). Seacoast concluded that section 307(a)(2) called for rulemaking, not adjudication, and thus that section 509(b) shows that the Act contemplated that some determinations which are not expressly to be made "on the record" would be made by formal adjudications
 
 
 [53]
 Section 307(a)(2) begins by requiring the Administrator to propose a standard "in accordance with section 553 of title 5." Subsection c of 5 U.S.C. § 553 (1976) (emphasis added), the "notice and comment" rulemaking provision of the Administrative Procedure Act (APA), provides that "(w)hen Rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of . . . subsection (c)."
 Section 307(a) provides that something must be made "on the record after opportunity for an agency hearing." However, it does not speak of "Rules " on the record, but only of a "Find(ing) " on the record (the Finding "that a modification of such proposed standard (or prohibition) is justified based upon a preponderance of evidence adduced at such hearings"). Section 307(a)(2). To be sure, this finding is an integral part of the promulgation of "a revised effluent standard (or prohibition)." Unless this finding is made, a revised standard may not be promulgated. Section 307(a)(3). However, by citing section 553 rather than 5 U.S.C. §§ 556 & 557 (1976), the statute intimates that rules, unlike findings, need not be made on the record. Cf. United States v. Florida E. Coast Ry. Co., 410 U.S. 224, 234, 237-38, 93 S.Ct. 810, 816, 817, 35 L.Ed.2d 223 (emphasizing importance of the particular words "rules . . . required by statute to be made on the record."). See also National Asphalt Pavement Ass'n v. Train, 176 U.S.App.D.C. 296, 539 F.2d 775 (1976) (parallel statutory scheme under Clean Air Act employing informal rulemaking).
 
 
 [54]
 EPA gave the following justification in proposing the new rule:
 The provision for a tentative decision, § 104.14, is amended in several respects. While the alternative of designating a responsible employee of the Agency to prepare a recommended decision is deleted, the new provision expressly recognizes the fact that in reviewing the entire record and preparing a tentative decision within the extremely tight time constraints of Section 307(a), the Administrator will have to utilize staff assistance. This is routine practice in most federal administrative agencies, and is essential given the workloads and responsibilities of the officials at the top of such agencies. . . .
 Finally, the former provision in § 104.16 with respect to ex parte discussions has been deleted as unnecessary. The statutory language together with the framework provided by these rules set forth the complete mechanism by which interested persons may submit evidence and material to the Agency on the record with respect to the Agency's proposed standards. The promulgated standards in turn are to be based solely on that record. Cf., Administrative Procedure Act, 5 U.S.C. Section 556(e). With respect to discussions between the Administrator and Agency staff involved in the presentation of evidence at the hearing, the rule requiring separation of functions which applies in cases of adjudication, 5 U.S.C. Section 554(b), is inapplicable to rulemaking. Hoffmann-La Roche, Inc. v. Kleindienst, 478 F.2d 1 (3rd Cir. 1973); Willapoint Oysters v. Ewing, 174 F.2d 676 (9th Cir. 1949), cert. den. 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527, rehearing den. 339 U.S. 945, 70 S.Ct. 793, 94 L.Ed. 1360; Wilson & Co. v. United States, 335 F.2d 788 (7th Cir. 1964), remanded by stipulation on other grounds, 382 U.S. 454, 86 S.Ct. 643, 15 L.Ed.2d 523 (1966); Davis, Administrative Law Treatise, 1970 Supp., p. 443.
 
 
 [41]
 Fed.Reg. 1766 (1976)
 
 
 [55]
 Hercules' Motion for Leave to Serve Interrogatories upon Respondent EPA, April 28, 1977
 
 
 [56]
 Order of May 17, 1977 (per curiam)
 
 
 [57]
 The supplemental memoranda were submitted in response to an order of this court. Order of April 25, 1978
 
 
 [58]
 Dicta in these cases concerning intra-agency staff contacts appear conflicting. Compare Action for Children's Television v. FCC, 183 U.S.App.D.C. 437, 450, 564 F.2d 458, 471 & n. 22 (1977) With Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 188, 567 F.2d 9, 55 (per curiam), Cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)
 
 
 [59]
 5 U.S.C. § 554(d) (1976) provides as follows:
 The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not
 (1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or
 (2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.
 An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply
 (A) in determining applications for initial licenses;
 (B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or
 (C) to the agency or a member or members of the body comprising the agency.
 Since this proceeding involves rulemaking, we need not decide whether Ms. Marple, as the EPA's chief judicial officer, would be exempt from the strictures of 5 U.S.C. § 554(d) as "the agency or a member or members of the body comprising the agency." 5 U.S.C. § 554(d)(C); See S.Rep.No.752, 79th Cong., 1st Sess. 18 (1945); H.R.Rep.No.1980, 79th Cong., 2d Sess. 30-31 (1946); U.S.Code Cong.Serv. 1946, p. 1195.
 
 
 [60]
 5 U.S.C. § 557(d) (1976) generally prohibits ex parte communications between agency decisionmaking officials and interested persons outside the agency during formal, "on-the-record" proceedings. Intra-staff contacts are clearly exempt from the strictures of this section. As both the Senate and House Reports state: "Communications solely between agency employees are excluded from the section's prohibition." S.Rep.No.354, 94th Cong., 1st Sess. 36 (1975); H.R.Rep.No.880, 94th Cong., 2d Sess. 20 (1976); U.S.Code Cong. & Admin.News 1976, p. 2202
 
 
 [61]
 Further, the Attorney General, in a letter to the Senate Judiciary Committee, noted that rulemaking exempt from 5 U.S.C. § 554(d) "includes a wide variety of subject matters, and within the scope of those matters it is not limited to the formulation of rules of general applicability but includes also the formulation of agency action whether of general or particular application. . . ." See S.Rep.No.752, Supra note 59, at 41
 Because the statutory language and legislative history are so unambiguous, we reject petitioners' assertion that 5 U.S.C. § 554(d) applies to the decisionmaking stage of the instant proceedings merely because 5 U.S.C. § 556(e) requires the decision to be on the record. See Hercules' Reply to EPA's Opposition, April 28, 1977, at 4-5.
 
 
 [62]
 See Hoffmann-La Roche, Inc. v. Kleindienst, 478 F.2d 1, 12-13 (3d Cir. 1973); Wilson & Co. v. United States, 335 F.2d 788, 794 (7th Cir. 1964), Cert. denied, 380 U.S. 951, 85 S.Ct. 1082, 13 L.Ed.2d 968 (1965). See generally, K. Davis, Administrative Law of the Seventies, §§ 13.00, 13.02, 13.06 (1976 & Supp.1977)
 
 
 [63]
 An examination of the loosely organized and voluminous record demonstrates the nature and extent of the practical difficulties facing the judicial officer. The record is composed of a great variety of materials in numerous forms affidavits, live testimony, scientific studies, legal materials, etc. from which the judicial officer was to draw her conclusions. We need hardly remark that the task of understanding, evaluating, and analyzing these materials in a relatively short period of time is a difficult one. Indeed, the fact that some of the parties were unable to complete some of their citations to the record in their submissions to this court is illustrative
 
 
 [64]
 Two recent Supreme Court cases sanction use of less elaborate procedures in enforcing the food and drug laws. United States v. Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (criminal enforcement without proof of intent); Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 617-20, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (summary administrative proceedings without oral hearings). In accepting these procedures, the Court looked to the broad purposes of the food and drug laws and noted that these laws " 'touch phases of the lives and health of the people which, in the circumstances of modern industrialism, are largely beyond self-protection.' " United States v. Park, 421 U.S. at 668, 95 S.Ct. at 1909 (quoting United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48 (1943)). This rationale applies with equal or greater force to protection against the hazards of exposure to toxic substances
 
 
 [65]
 The fact that the Administrator gave petitioners a year to comply with the regulations does not detract from the urgency of promulgating regulations. The 1972 Act and the judicial decree combined the mandate for rapid administrative action with provision for a period of compliance. The ultimate rationale for deadlines was, of course, to protect the public and the environment as soon as possible from the special dangers of toxic pollutants. See Note 67 Infra. Lead time for compliance after issuance of regulations was a realistic adjustment to the fact that controlling the discharge of dangerous substances from massive industrial complexes is not a matter always susceptible to the kind of simple action taken to guard against impure food or drugs. The rationale for a period of compliance emphasizes the necessity for swift issuance of regulations. In EPA's view, it was necessary to give industry one year after the issuance of regulations to comply. Thus, it is all the more important that industry be directed to comply as early as possible, lest exposure last even longer. Moreover, the decision that administrative action proceed swiftly was not EPA's; it was Congress's. See generally Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 600, 70 S.Ct. 870, 94 L.Ed. 1088 (1950)
 
 
 [66]
 The tentative decision procedural regulations, 40 C.F.R. § 104.14 (1977) were modified in 1976 when the EPA modified its procedural rules governing toxic proceedings. 41 Fed.Reg. 17898 (1976). At the time the rules were adopted, EPA noted that the preparation of a tentative decision and a concomitant opportunity to file exceptions and supporting briefs were "an important feature of the proceeding." Accordingly, it retained its general requirement that a tentative decision could only be omitted where the Administrator determines that "due and timely execution of his function imperatively and unavoidably so requires." However, it declined to impose a thirty-day time period for exceptions following the issuance of the tentative decision, believing this was best left to the discretion of the presiding officer or the Administrator
 Further, EPA declined to require the Administrator to publish the tentative decision in the Federal Register noting that "the tight statutory timetable established in section 307(a)(2) simply does not allow sufficient time for such publication and the receipt of meaningful comments thereto, nor is it clear what if any further procedures should be conducted following receipt of such comments." 41 Fed.Reg. 17902.
 
 
 [67]
 Section 101(a), 33 U.S.C. § 1251(a) (1976), provides in part:
 The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter
 (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;
 (2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;
 (3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited.
 The intent expressed in subsection (a)(3) with respect to discharges of toxic pollutants contrasts with the intent expressed for other pollutants in subsection (a)(1). Subsection (a)(1) expresses a "goal" and defers achievement of the goal for thirteen years following enactment of the legislation. Subsection (a)(3) expresses a "policy." It makes no provision for deferment, implying that the policy should be carried out immediately as provided by the swift timetable of section 307(a).
 
 
 [68]
 The district court's opinion in NRDC v. Train, 8 ERC (BNA) 2120 is dated June 8, 1976. The agreement between the parties is dated June 7, 1976. Id. at 2129
 
 
 [69]
 Even without having published a tentative decision, the Administrator missed the deadlines provided by the statute and the judicial decree. Although it is not clear how long it would take to gather comments, there can be no doubt that there would have been further delay if the Administrator had published a tentative decision, the parties had analyzed it, and the Administrator had prepared a final decision
 
 
 [70]
 As Hercules points out, the Administrator did not explicitly determine that it was imperative that he omit a tentative decision. However, he did refer expressly to 40 C.F.R. § 104.14(c), and we deem this sufficient
 
 
 [71]
 The significance of the issue before us is somewhat limited in light of Inland Steel Co. v. EPA, 574 F.2d 367 (7th Cir. 1978), which held that EPA may include "re-opener" provisions in permits, authorizing their subsequent modification to incorporate newly adopted or revised toxics standards. That case is in complete accord with our own; through a more thorough analysis than we deem necessary in this case, that court reached a conclusion akin to ours. "There is nothing in § 307 or elsewhere in the Act to indicate that Congress intended to excuse permit holders from full compliance with that section. . . . (This is true) especially in view of the importance Congress attached to prompt compliance with toxic pollutant standards." Id. at 371
 
 
 [72]
 Hercules argues that the term "injurious to human health" should be considered analogous to the term, "has an adverse effect on public health or welfare" employed in section 108 of the Clean Air Act Amendments of 1970, formerly codified at 42 U.S.C. § 1857c-3(a)(1)(A) (1970), which this court construed to require proof that current levels of the pollutant are causing "actual harm." Ethyl Corp. v. EPA, 176 U.S.App.D.C. at 386, 541 F.2d at 14. (Section 108, now codified at 42 U.S.C.A. § 7408(a)(1)(A) (1977), was amended in 1977 to replace the "adverse effect" language with other language. This amendment does not affect Hercules' argument that the Ethyl Construction would suit the term involved in this case.) The analogy is unpersuasive. Hercules does not show any parallel in the purpose or legislative history of the two provisions. The provision in section 108 could appropriately call for an elaborate test, since it was a threshold for an entire statutory standard-setting procedure. Ethyl Corp. v. EPA, 176 U.S.App.D.C. at 386, 541 F.2d at 14. It is unlikely that the provision in section 402(k) would call for an elaborate test involving estimates of public health, since it involves merely an aspect of implementation
 
 
 [73]
 In light of the evidence of the effects of toxaphene and endrin, which we discuss elsewhere in this opinion, it could hardly be argued, and it is not in fact disputed, that the two substances meet the test set by EPA